750 A.2d 602

Edward S. GOLDSTEIN

v.

91 ST STREET JOINT VENTURE et al.

No. 5538, Sept. Term, 1998.

Court of Special Appeals of Maryland.

April 26, 2000.

Raymond S. Smethurst, Jr. (Robert B. Taylor and Adkins, Potts & Smethurst, LLP, on the brief), Salisbury, for appellant.

Stephen J. Nolan (C. William Clark and Nolan, Plumhoff & Williams, Chtd., on the brief), Towson, for appellees.

Argued before MOYLAN, HOLLANDER and SALMON, JJ.

SALMON, Judge.

The origin of the dispute that gives rise to this appeal lies in the intense dislike that appellant, Edward S. Goldstein ("Goldstein"), has for Malcolm Berman ("Berman").[1] Both Berman

---

1. Berman and Goldstein have had prior disputes that landed in this Court. *See 91st Street Joint Venture v. Goldstein,* 114 Md.App. 561, 581, 691 A.2d 272 (1997), a case in which Berman and others attempted unsuccessfully to utilize a "charging order ... to obtain a 'business divorce'" from Goldstein.

and Goldstein own interests in a partnership that operates the Princess Royale Hotel and Convention Center located in Ocean City, Maryland. The enmity between Goldstein and Berman ultimately led to a lengthy arbitration hearing, after which the arbitrator gave Berman and his cohorts the option of dissolving the partnership. The option to dissolve was exercised, and the arbitration award was confirmed by the Circuit Court for Baltimore County. Thereafter, the trial judge was called upon to decide whether Goldstein had a right to have the assets of the partnership liquidated. To make that determination, the court endeavored to interpret section 9–609 of the Corporations and Associations Article of the Maryland Code (1975, 1993 Repl.Vol. & 1998 Supp.) as it was written prior to July 1, 1998.[2] Section 9–609 is a part of the Maryland Uniform Partnership Act[3] ("UPA") and provides, in pertinent part, as follows:

**Rights of partners as to application of partnership property.**

(a) *General rule.—When dissolution is caused* in any way, except *in contravention of the partnership agreement,* each partner, as against his copartners and all persons claiming through them in respect of their interests in the partnership, unless otherwise agreed, may have the partnership property applied to discharge its liabilities, and the surplus applied to pay in cash the net amount owing to the respective partners. . . .

(b) *Dissolution caused in contravention of agreement.— When dissolution is caused in contravention of the partner-*

---

**2.** Unless otherwise indicated, all Uniform Partnership Act statutory references are to Maryland Code (1975, 1993 Repl.Vol., 1998 Supp.), Corporations and Associations Article.

**3.** The Act that now governs Maryland partnerships is the Revised Uniform Partnership Act (RUPA), Maryland Code (1975, 1993 Repl. Vol., 1998 Supp.), Corporations and Associations Art., section 9A–101 *et seq.,* which was adopted in July 1998 with a phase-in period. Therefore, until December 31, 2002, both UPA and RUPA will coexist, with section 9A–1204 determining which Act applies to a particular partnership's formation, termination, and any other conflict that may arise.

*ship agreement,* the rights of the partners shall be as follows:

(1) Each partner who has not caused dissolution wrongfully shall have:

(i) All rights specified in subsection (a) of this section; and

(ii) The right, as against each partner who has *caused the dissolution wrongfully,* to damages for breach of the agreement.

(2) The partners who have not *caused the dissolution wrongfully,* if they all desire to continue the business in the same name, either by themselves or jointly with others, may do so, during the agreed term for the partnership and for that purpose may possess the partnership property, provided they secure the payment by bond approved by the court, or pay to any partner who has caused the dissolution wrongfully, the value of his interest in the partnership at the dissolution, less any damages recoverable under paragraph (1)(ii) of this subsection, and in like manner indemnify him against all present or future partnership liabilities.

(Emphasis added.)

Reduced to its essentials, the major issue that concerned the trial court was whether Goldstein caused the dissolution of a partnership "in contravention of a partnership agreement" as that phrase is used in section 9–609. If Goldstein did act "in contravention," then the "innocent" partners' rights are controlled by section 9–609(b) of the UPA. In this case, Berman, and others, maintained that the "winding up" of partnership affairs was to be governed by section 9–609(b) of the UPA. Accordingly, Goldstein's erstwhile partners had the property appraised, attempted to pay off Goldstein, and continued the business of the partnership, sans Goldstein.

Goldstein contends that the partnership [4] should have been dissolved pursuant to section 9–609(a) by liquidating the assets

---

**4.** In this opinion, the terms "joint venture" and "partnership" are used interchangeably.

of the partnership, paying off all partnership debt, and dividing the remaining proceeds between the partners according to their interests. If the partnership were liquidated, one of the consequences would be that Goldstein could collect immediately a $1.1 million development fee owed to him by the partnership. If section 9–609(b) is applicable, Goldstein would not have the right to payment of the fee any time soon.

The trial judge ultimately ruled in favor of appellees (who will be named *infra* ) based upon his reading of the arbitrator's decision as well as his interpretation of section 9–609 of the UPA. Goldstein filed this timely appeal.

## I. BACKGROUND FACTS

One of the appellees, 91st Street Joint Venture, is a Maryland general partnership, whose partners since 1988 have been Joint Venture Holding, Inc., and Princess Hotel Limited Partnership (collectively, the "Berman Partners") and Goldstein. Malcolm C. Berman controls the Berman Partners. The Berman Partners own more than a ninety-nine percent interest in 91st Street Joint Venture ("Joint Venture"). The appellees in this case are the Joint Venture along with the Berman Partners. Appellant Goldstein, at all times here pertinent, owned less than a one-fifth-of-one-percent interest in the Joint Venture. The fixed term of the Joint Venture was until September 30, 2040, or until the dissolution of the Joint Venture due to Goldstein's death.

In 1988, the Joint Venture commenced construction of the Princess Royale Hotel and Convention Center. Berman oversaw the construction and operation of the project.

The Joint Venture was governed by a "restated and amended 91st Street Joint Venture agreement" ("the Agreement"). The Agreement provides that the parties "are bound" by the Maryland UPA. Section 6.5 of the Agreement reads:

6.5 *Developer's Fee and Certain Distributions*

Notwithstanding anything to the contrary contained herein, the $2.6 Million Dollars provided by the Partnership [Princess Hotel Limited Partnership] to the Joint Venture

shall be paid to the Partnership prior to any other distributions being made hereunder. Thereafter, each of Goldstein and JVH [Joint Venture Holding, Inc.] shall be entitled to receive $1.1 Million Dollars as a Developer's Fee in connection with their services rendered to the Joint Venture in structuring and organizing the Joint Venture. Following distribution to the Partnership of its $2.6 Million Dollars *and $1.1 Million Dollars each to Goldstein and JVH,* any further distributions shall be made to the Joint Venturers in accordance with their capital accounts.

(Emphasis added.) The Agreement also provided for the submission to binding arbitration by the American Arbitration Association of all disputes arising out of the Agreement.

In 1996, the Berman partners decided to refinance the debt of the Joint Venture by taking out a loan from First Union Bank of Maryland ("First Union") and using the proceeds of the loan to pay off the existing lender, NationsBank, N.A. First Union agreed to lend the Joint Venture up to 12.5 million dollars with an interest rate of 7.125 percent per year. The agreement with First Union was very attractive to the Berman Partners because NationsBank charged the Joint Venture a significantly higher interest rate. The First Union agreement with the Joint Venture provided, *inter alia,* that payment of the $1.1 million developer's fee to Goldstein would be deferred for 12.5 years. The NationsBank loan had a somewhat similar provision that precluded the payment of the developer's fee until such time as NationsBank either consented to the $1.1 million payment or its loan was paid off. The Berman Partners sought Goldstein's consent to the proposed First Union loan, which required Goldstein to give his personal guaranty, albeit for only a small portion of the total loan.[5] To secure Goldstein's consent, Malcolm Berman agreed to indemnify Goldstein completely from any potential exposure as a result of his guaranty. Nevertheless, Goldstein insisted that before making a decision he wanted his partners to

---

5. Goldstein was required to guarantee only approximately $26,000 of the First Union loan.

supply him with a great deal of financial information concerning the operation of the Joint Venture. In addition, Goldstein informed his partners that he would not approve the First Union loan, or personally guaranty any portion of it, as long as there was a requirement that payment of his $1.1 million developer's fee be deferred.

In November of 1996, the Berman Partners filed with the American Arbitration Association a demand for arbitration of their claims that Goldstein had: (1) consented to the proposed refinancing with First Union or, alternatively, (2) breached a fiduciary duty to the Joint Venture by, *inter alia*, his failure to approve and guarantee a portion of the proposed First Union loan. Thereafter, the Berman Partners amended their arbitration demand to seek an additional ruling that Goldstein's conduct made him a defaulting partner pursuant to section 14.1 of the Agreement.

Section 14.1 lists numerous ways that a partner's conduct may constitute a default under the Agreement, one of which is if a partner breaches "any of the terms, provisions, covenants, or agreements contained in the Partnership Agreement." If a partner defaults under section 14.1, the non-defaulting partners have certain rights, including those set forth in section 14.2 of the Agreement. Section 14.2 reads:

> *Continuing the Joint Venture Business.* Upon the election of a nondefaulting Joint Venturer to dissolve the Joint Venture pursuant to Section 14.1, the nondefaulting Joint Venturer shall have the right to continue the business of the Joint Venturer. The nondefaulting Joint Venturer shall purchase the defaulting Joint Venturer's interest at a purchase price determined by the appraisal procedures set forth in Section 19; provided, however, that any damages resulting from the breach by the defaulting Joint Venturer shall be deducted from the purchase price. Upon payment of the purchase price (minus damages), the interest of the defaulting Joint Venturer shall be transferred to the nondefaulting Joint Venturer upon the nondefaulting Joint Venturer's assumption of the obligations of the defaulting Joint

Venturer under this Agreement. The purchase price (minus damages) must be paid in cash.

It should be noted that the rights of a non-defaulting partner under section 14.2 are quite similar to the rights granted to an "innocent" partner by section 9–609(b) of the UPA.

For remedies, the Berman Partners asked the arbitrator to grant them (1) the right to dissolve the Joint Venture, (2) the right to continue the business of the Joint Venture, (3) the right to purchase Goldstein's interest in the Joint Venture, and (4) monetary damages. Goldstein filed a counterclaim in which he sought, *inter alia*, certain financial documents from the Joint Venture.

A six-day evidentiary hearing was held before the arbitrator, followed by post-hearing briefing and oral argument. The arbitrator, Jonathan A. Azrael, Esq., made his initial award on June 30, 1997. Azrael ruled that Goldstein had not breached his fiduciary duty to appellees nor had he breached any other obligation owed to his partners by withholding his consent to the proposed First Union loan, or by withholding his personal guaranty of that loan. The arbitrator also rejected appellees' contention that Goldstein had breached his fiduciary duty to the Joint Venture in several other ways.[6]

In Paragraph 7 of the arbitrator's award it was stated:

---

**6.** In regard to the other claims of breach of fiduciary duty, the arbitrator stated:

3. The claim that Respondent breached a fiduciary duty or other obligation to 91st Street Joint Venture by allegedly cooperating with Mark F. Rosenberg in connection with legal action instituted by Mr. Rosenberg against the Joint Venture is DENIED.

4. The claim that Respondent breached a fiduciary duty or other obligation to 91st Street Joint Venture by allegedly cooperating with Mark F. Rosenberg in connection with legal action instituted by Mr. Rosenberg against the Joint Venture is DENIED.

5. The claim that Respondent breached a fiduciary duty or other obligation to 91st Street Joint Venture by virtue of his letter to the Worcester County Liquor Board dated February 17, 1995 is DENIED.

6. The claim that Respondent breached a fiduciary duty or other obligation to the 91st Street Joint Venture by critical statements made to John Tremillans about Malcolm Berman is DENIED.

7. The evidence clearly supports a finding that due to animosities on the part of [Goldstein] towards Malcolm Berman, [Goldstein] has so conducted himself in matters relating to the partnership that it is *not reasonably practicable to carry on the business in partnership with him, and further, that it is equitable to dissolve this partnership.* Upon application by Claimant, within fifteen (15) days from the date this Award is mailed to the parties, this Award will be modified to effect a dissolution of the Joint Venture under § 9–603(4) and (6) of the Maryland Uniform Partnership Act. If Claimant does not make such application, no such dissolution will be ordered.

(Emphasis added.)

In addition, the arbitrator ruled in favor of Goldstein concerning one of his cross-claims by holding that Goldstein was entitled to certain financial disclosures by the Joint Venture.

The appellees filed a timely application seeking "modification, correction and clarification" of the award. That application pointed out that the initial award did not address the Berman Partners' claim that Goldstein had breached a duty owed to the Joint Venture by filing various lawsuits against the Joint Venture and the Berman Partners. As a consequence of these derelictions, they purportedly were entitled "to continue the business of the partnership pursuant to the [Joint Venture] agreement[,] section 14.2[,] and to proceed to acquire Goldstein's interest in lieu of a liquidation of partnership assets." In addition, the Berman Partners referred to their claims that Goldstein had breached both his fiduciary duty and the provisions of the Joint Venture agreement and asked the arbitrator to determine that they "had the right to continue the business of the Joint Venture in accordance with section 14.2 of the Joint Venture agreement *and in accordance with section 9–609(b)(2) of the Maryland Uniform Partnership Act.*" (Emphasis added.) They also requested a determination that they,

as non-defaulting Joint Venturers, [could] purchase Goldstein's partnership interest at a purchase price determined

by the appraisal procedures of Section 19, in lieu of a Section 16 liquidation [sale] of all partnership assets as part of the dissolution ... [because] a Section 16 liquidation would have horrendous tax consequences for the Joint Venture and its Partners.

Goldstein filed an answer to appellees' application seeking modification, etc., after which appellees filed a reply to Goldstein's answer. In their reply, appellees said:

Unless this Arbitrator correctly finds that Respondent is a defaulting partner as described in Part I above, these proceedings will have accomplished nothing except to get rid of a bogus counterclaim, thereby leaving the parties in the same position as when this all began.

On August 25, 1997, the arbitrator issued a "modification, correction, and clarification of award" that rejected all the claims of the appellees, save one, which is not here relevant. Most significantly, the arbitrator said in his August 25, 1997, award:

4. The claim that the Award should be modified because [Goldstein] failed to cooperate in obtaining financing from NationsBank in 1994 and First Union in 1996 is DENIED.

5. The claim that the Award should be modified to find that [Goldstein] is a "defaulting partner" and that Joint Venture Holding, Inc. and Princess Hotel Limited Partnership have a right to continue the business of the Joint Venture is DENIED.

Shortly after the appellees received the "modification, correction and clarification of award," they applied to the arbitrator for "a modified award to effect a dissolution of the ... Joint Venture under Section 9–603(a)(4) and (6) of the [ ]UPA pursuant to Paragraph 7 of the initial award." This was not opposed by Goldstein. Several weeks later, on September 29, 1997, the arbitrator entered his "Second Modified Award," which stated in pertinent part: "[The Berman Partners] are ordered and directed to dissolve the Joint Venture in accordance with the Maryland Uniform Partnership Act."

On November 4, 1997, counsel for Goldstein wrote to appellees' counsel and said, in pertinent part:

Having elected to dissolve the partnership, Joint Venture Holding, Inc. is obliged to liquidate the partnership's assets, pay the partnership debts and then distribute whatever is left among the partners in accordance with their percentage interests. Furthermore, I believe Mr. Goldstein has the right to be informed of and actually be a participant in the dissolution process.

About five months later, on April 14, 1998, counsel for appellees sent a letter to Goldstein's counsel and advised him that the Joint Venture had been dissolved in accordance with section 9–609(b) of the UPA; that Goldstein's share of the Joint Venture was determined to be worth $12,941; and that the Berman Partners were buying him out and continuing the Joint Venture's business. The letter from appellees' counsel included the following passages:

1. An appraisal of the real property, tangible personal property and intangible personal property owned by the Partnership [Joint Venture] including the Princess Royale Hotel, has been conducted by Lipman Frizzell & Mitchell, LLC. A copy of the appraisal is enclosed. The value of all other Partnership property, as specified in § 9–611 of the Act, was determined by Jim Jones, CPA, of Weinberg, Griffith, Tucker & Jones. The value of *all* of the Partnership property comprised the entire value of the Partnership (the "Entire Value").

2. The amount of all Partnership liabilities was calculated by Mr. Jones.

3. The net value of the Partnership was calculated and determined by subtracting the amount of all Partnership liabilities from the Entire Value of the Partnership (the "Net Value"). A copy of Mr. Jones' calculation as well as his year end review of the partnership financials is enclosed.

4. A check for your proportionate share of the Net Value of the Partnership has been attached to this letter (less the judgment dated July 7, 1997 held by 91st Street

Joint Venture and others against you in the amount of $1,336.32 plus interest at 10% in the amount of $101.39). *Please note that because the arbitrator determined that your conduct caused the dissolution of the Partnership, it would be appropriate for the Partnership to withhold from the disbursement the amount of damages that your conduct has caused.* Such an amount has not been withheld[;] however, if you challenge the amount of the payment sent to you, the Partnership and remaining Partners reserve the right to assess such damages against you.

5. An indemnity agreement has been executed by Joint Venture Holding, Inc. and Princess Hotel Limited Partnership (the other Partners), indemnifying you from any Partnership liabilities and is enclosed with this letter.

6. Joint Venture Holding, Inc. and Princess Hotel Limited Partnership have obtained a release for you from NationsBank; the release is enclosed with this letter.

7. The remaining assets of the Partnership have been distributed to Joint Venture Holding, Inc. and Princess Hotel Limited Partnership, as the other Partners, who will also assume the Partnership debt as called for under the Act.

(Emphasis added.)

All parties are in accord that the actions taken by appellees (as described in the letter) were proper only if the dissolution of the partnership was caused by actions taken by Goldstein "in contravention of the partnership agreement" as that phrase is used in section 9–609 of the UPA.

On April 14, 1998—which was the same day that counsel for appellees wrote to Goldstein's counsel—the circuit court signed a consent order and judgment pursuant to section 3–227 of the Courts and Judicial Proceedings Article (1998 Repl.Vol. & Supp.1999). In its consent order, the court confirmed the arbitration Award dated June 30, 1997, the Modification, Correction, the Clarification of Award dated August 25, 1997, and the Second Modified Award dated September 29, 1997.

Four days after the consent judgment was entered, Goldstein's attorney responded to the letter from counsel for appellees. In the letter, counsel objected to the Berman Partners proceeding in accordance with section 9–609(b) and asserted that the dissolution "must proceed pursuant to Section 9–609(a) of the UPA." Goldstein's counsel pointed out that the arbitrator denied claims that Goldstein had breached any fiduciary duty or other obligation owed to the Joint Venture and denied, as well, the Berman Partners' contention that they had a right to continue the business of the Joint Venture. Counsel demanded that the Berman Partners dissolve the Joint Venture by liquidating the partnership property "to the end that *all* liabilities be *discharged* and 'the surplus applied to pay in cash the net amounts owing to the respective partners.' " (Emphasis in original.)

After additional correspondence made it clear that the partners were hopelessly at odds as to which subsections of section 9–609 were applicable, Goldstein filed, in the Circuit Court for Baltimore County, a "Cross Petition to Enforce Consent Order and Judgment Confirming Arbitration Award." In his cross petition, Goldstein asked the circuit court to (1) order the liquidation of the Joint Venture, (2) order the Berman Partners to return any Joint Venture assets loaned or distributed to them, (3) appoint a receiver to wind up the Joint Venture's affairs, and (4) order the Berman Partners to pay Goldstein the costs (including reasonable attorneys' fees) incurred by him in connection with his suit to enforce the arbitration award.

Appellees responded by filing a motion to dismiss or, alternatively, for summary judgment. Goldstein, in turn, filed a motion for summary judgment. The trial judge denied Goldstein's motion and granted both of appellees' motions.

## II. PRELIMINARY MATTERS

An interesting feature of the briefs filed in this case is that both sides point with pride to the decisions of the arbitrator and assert their entitlement to summary judgment based on

the assumption that they "won" before the arbitrator. Goldstein presents as his first question:

1. Should *res judicata* be accorded to an arbitration award entered in a formal proceeding that both provided for and involved the presentation of evidence and written memoranda substantially similar in form and scope to a judicial proceeding?

Appellees counter:

The question arising here consists of whether the [a]rbitrator, and the judgment confirming his award, decided that [a]ppellees could dissolve the partnership, continue the business and pay [a]ppellant the net value of his share. *In terms of issue preclusion, has this issue been litigated and decided? Appellee[s] contend[ ] that it has.*

Appellant seeks to catch this Court's attention and fancy by raising the specter that the facts of this case present a case of first impression in Maryland. He contends that for the first time, a litigant poses the question whether a confirmed arbitration award, entered in a judicial-like proceeding is accorded *res judicata* effect. He cites *Ewing v. Koppers Co.*, 312 Md. 45 [537 A.2d 1173][,] and its reference to § 83 and § 94 of the Restatement [Judgments, Second]. Appellant glosses over an important distinguishing fact which prevents the application of that doctrine and which prevents that interesting question from arising here. The "earlier case" and its decision which [a]ppellant seeks to enforce, is not a binding arbitration proceeding ending in a decision of that tribunal, but rather is a judgment of the Circuit Court for Baltimore County confirming an arbitration award, to which [a]ppellant consented. Thus, it is a consent judgment which constitutes the "earlier case," not a valid and final award of binding arbitration that one might ask whether it should be given effect as a judgment of a court as the Restatement suggests.

(Emphasis added.)

We agree with appellees that, technically speaking, it is not the arbitrator's award that is entitled to be enforced. Rather,

it is the consent judgment entered on April 14, 1998, which must be given *res judicata* (issue preclusion) effect. This makes no practical difference, however, because the April 14th judgment confirmed in all respects the arbitration awards of June 30, August 25, and September 29, 1997.

In this appeal, both sides agree that appellees had a right to dissolve the partnership. They also agree that the trial court acted properly when he signed the consent decree dated April 14, 1998. But, as the parties recognized in their briefs, the central question presented is whether the arbitrator granted, or denied, appellees the right to dissolve the partnership under the provisions of section 9–609(b) of the UPA.

## II.

Was the trial judge legally correct when he granted summary judgment in favor of appellees?

### A. Standard of Review

In reviewing a lower court's grant of summary judgment, the standard is simply whether that court was correct as a matter of law. *Beatty v. Trailmaster Prods., Inc.*, 330 Md. 726, 737, 625 A.2d 1005 (1993); *see also Heat & Power Corp. v. Air Prods. & Chems., Inc.*, 320 Md. 584, 591, 578 A.2d 1202 (1990); *King v. Bankerd*, 303 Md. 98, 111, 492 A.2d 608 (1985). A grant of summary judgment is proper when the movant clearly has demonstrated the absence of any genuine issue of material fact and that he or she is entitled to judgment as a matter of law. Md. Rule 2–501(e); *Castiglione v. Johns Hopkins Hosp.*, 69 Md.App. 325, 332, 517 A.2d 786 (1986). In its review, an appellate court is limited to examining the same information from the record and decides the same issues of law as the trial court. *Nationwide Mut. Ins. Co. v. Scherr*, 101 Md.App. 690, 695, 647 A.2d 1297 (1994).

### B. The Trial Judge's Opinion

Section 9–603 governs when a court may dissolve a partnership. It reads:

**Dissolution by decree of court.**

(a) *Application by or for partner.*—On application by or for a partner, the court shall decree a dissolution whenever:

(1) A partner has been declared a lunatic in any judicial proceeding or is shown to be of unsound mind;

(2) A partner becomes in any other way incapable of performing his part of the partnership contract;

(3) A partner has been guilty of such conduct as tends to affect prejudicially the carrying on of the business;

(4) A partner willfully or persistently commits a breach of the partnership agreement, or otherwise so conducts himself in matters relating to the partnership business that it is not reasonably practicable to carry on the business in partnership with him;

(5) The business of the partnership can only be carried on at a loss; or

(6) Other circumstances render a dissolution equitable.

(b) *Application of purchaser of interest.*—On the application of the purchaser of a partner's interest under § 9–504 or 9–505, the court shall decree a dissolution:

(1) After the termination of the specified term or particular understanding;

(2) At any time if the partnership was a partnership at will when the interest was assigned or when the charging order was issued.

As noted earlier, the arbitrator found in paragraph 7 of his initial award that the partnership could be dissolved, at the option of the appellees, under section 9–603(a)(4) and (6). Specifically, he found that due to Goldstein's animosity toward Berman it was "not reasonably practicable to carry on the business in partnership" with Goldstein. The arbitrator also found that it would be "equitable to dissolve the partnership." It should be noted, however, that the arbitrator did not explicitly find that Goldstein acted in "contravention of the partnership agreement."

The trial judge, in granting summary judgment in favor of appellees, emphasized the portion of the arbitrator's findings that was set forth in paragraph 7 of the initial award and then said:

In construing a statute, all parts, provisions or sections of a statute should be read, considered or construed together so that all parts are consistent with its general object and scope and to give effect, if possible, to all such parts. When reading § 9–603[ (a) ](4) in context and together it seems reasonable to infer that the legislat[ure] intended both acts to be wrongful conduct by a partner in contravention of the partnership agreement. It is further clear that it is their desire, pursuant to § 9–609[ (b) ](2), to allow the partners who have not caused the dissolution wrongfully to continue the business if they desire. Therefore, it would be a reasonable interpretation to find that a partner that conducts himself in matters relating to the partnership business that is not reasonably practicable to carry on the business in partnership with him as an act which is in contravention of the partnership agreement and wrongfully causing the dissolution that, therefore, the rights of the partners shall be governed by § 9–609(b) and not (a) as argued by [Goldstein].

(Footnote omitted.)

### C. Three Ways of Construing § 9–609

Scholars have puzzled over the meaning of the term "in contravention of the partnership agreement" as that term is used in the UPA. Robert W. Hillman *The Dissatisfied Participants in the Solvent Business Venture: A Consideration of the Relative Permanence of Partnerships and Close Corporations,* 17 Minn. L.Rev. 1, 15 n. 49 (1982). The term "in contravention of the partnership agreement" is used not only in section 9–609 but in section 9–602. Section 9–602 reads:

**Causes of dissolution.**

Dissolution is caused:

(1) Without violation of the agreement between the parties:

(i) By the termination of the definite term or particular undertaking specified in the agreement;

(ii) By the express will of any partner when no definite term or particular undertaking is specified;

(iii) By the express will of all the partners who have not assigned their interests or suffered them to be charged for their separate debts, either before or after the termination of any specified term or particular undertaking;

(iv) By the expulsion of any partner from the business bona fide in accordance with such a power conferred by the agreement between the partners;

(2) *In contravention of the agreement between the partners, where the circumstances do not permit a dissolution under any other provision of this section, by the express will of any partner at any time;*

(3) By any event which makes it unlawful for the business of the partnership to be carried on or for the members to carry it on in partnership;

(4) By the death of any partner;

(5) By the bankruptcy of any partner or the partnership; or

(6) By decree of court under § 9–603.

(Emphasis added.)

### 1. A Literal Construction

One way of construing the term "in contravention" of the partnership agreement is to read the statute literally and to focus on the manner of the dissolution. This was explained by Robert A. Hillman in an article entitled: *Misconduct as a Basis for Excluding or Expelling a Partner: Effecting Commercial Divorce and Securing Custody of the Business*, 78 Nw. U.L.Rev. 527, 537–38 (1983). Substituting the Maryland Code references for those of the original Uniform Partnership Act that appear in the text, Hillman said:

### A. *The Meaning of "Wrongful"*

To avoid liquidation of partnership assets following a dissolution, it is normally necessary for the dissatisfied

partners to establish that the offending partner has "caused the dissolution wrongfully." Since the word "wrongful" usually is not utilized as a term of art, it may be thought that misconduct resulting in dissolution certainly should justify the imposition of section [9–609(b)] sanctions. An argument may be made, however, that the use of "wrongfully" in section [9–609(b)] is quite restricted and is intended to describe only those dissolutions which are *accomplished by the express will of a partner in violation of a partnership agreement establishing a term or undertaking for the venture.* Under this restrictive interpretation, a dissolution that is in *response* to misconduct by one of the partners would not be treated as caused wrongfully by the offending partner and, accordingly, a liquidation of assets generally would follow the dissolution.

A literal reading of sections [9–602] and [9–609] of the UPA supports a restrictive interpretation of "wrongful." Section [9–609] lists the methods by which a dissolution may be accomplished. Only one of the alternatives listed in section [9–602] is described as being *"in contravention of the agreement"* and that is "where the circumstances do not permit a dissolution under any other provision of this section, by the express will of any partner at any time." Section [9–609], in turn, is divided into two parts, the first dealing with dissolutions caused in any way "except in contravention of the partnership agreement" and the second describing as wrongful those dissolutions "caused in contravention of the partnership agreement." *If the term "in contravention" utilized in section [9–609] is defined by its use in section [9–602(2)], then the only dissolution which will be wrongful is one caused under section [9–602]—that is, a premature dissolution caused by the express will of a partner.* Under this approach, a dissolution caused by a judicial decree, for example, would not support the imposition of the sanctions for a dissolution caused wrongfully.

Several arguments may be offered in support of a restrictive interpretation of the circumstances under which a disso-

lution should be treated as caused wrongfully. As noted above, such an approach can be supported by a literal construction of sections [9–602] and [9–609]. In addition, imposing the sanctions *only when there is a premature dissolution by express will* provides an objective standard that is easily applied. Furthermore, the failure to impose sanctions in circumstances other than dissolution by express will does not deprive dissatisfied partners of the ability to seek other remedies that might be available when a partner has violated the partnership agreement or the standards for partnership conduct established by the UPA.

*Id.* at 537–38 (footnotes omitted) (emphasis added).

In the case *sub judice,* the dissolution of the fixed term partnership was caused by a judicial decree and, in any event, was unarguably not caused by the "express will" of Goldstein. Thus, section 9–602(2) would be inapplicable if the literal approach is utilized.

### 2. "In Contravention" Is Synonymous With "In Breach of Partnership Agreement"

Another approach to interpreting the language found in section 9–609 is one that equates the term "in contravention of the partnership agreement" with "breach of the partnership agreement." Again substituting the Maryland Code references for the code references in the original text, Professor Sandra Miller says:

Section [9–602] of the UPA lists three major categories of circumstances that trigger a voluntary dissolution: (1) cases involving no violation of the partnership agreement (so-called "rightful dissolutions"); (2) cases involving a contravention of the partnership agreement (so-called "wrongful dissolutions"); and (3) cases involving a death, bankruptcy, or court decree.

The UPA authorizes dissolution by court decree on the occurrence of specified circumstances. If, for example, a partner becomes insane, or the partner's conduct makes it impracticable to carry on the business, another partner may obtain a judicial dissolution of the partnership.

The consequences of the dissolution depend *on whether the dissolution is a result of a breach of the partnership agreement,* and, if so, whether the partner is the one who caused the breach, or is innocent of wrongdoing. *Under section [9–609(a)] of the UPA, if the dissolution is not due to a breach of the partnership agreement, each partner may have the property of the partnership applied to discharge the liabilities of the partnership. Any surplus is paid out to the respective partners.*

*If the dissolution is caused by breach of the partnership agreement and therefore "wrongful" under section [9–609(b)] of the UPA, the partner* causing the wrongful dissolution may suffer severe economic consequences. The copartners may sue the wrongful party for damages caused by the wrongful dissolution. Alternatively, if the copartners elect to continue the business, the wrongful party is not entitled to partnership property through an actual liquidation. Instead, the partner must accept settlement for the partnership interest. Importantly, goodwill is not considered in determining the buy-out price of the wrongful partner. The copartners may defer the actual payment to the wrongful party for his or her interest by securing the payment with a bond approved by the court. Thus, there is free dissolubility, but severe consequences should the dissolution be wrongful.

Sandra K. Miller, *What Remedies Should Be Made Available to the Dissatisfied Participant in a Limited Liability Company* 44 Am. U.L.Rev., 465, 483–85 (1994) (emphasis added) (footnotes omitted).

If, as Professor Miller says, the term "in contravention of the partnership agreement" means the same thing as "in breach of the partnership agreement," then appellees had no right to dissolve the partnership pursuant to section 9–609(b). This is true because the arbitrator specifically found that Goldstein had not breached any obligations owed to appellees under the partnership agreement.

It is obvious that appellees initially believed, like Professor Miller, that in order to dissolve the partnership under section

9–609(b), they were required to show that Goldstein had breached the Partnership Agreement. This belief first manifested itself when, after the arbitrator had made the findings set forth in paragraph 7 of his initial decision, the Berman Partners asked the arbitrator to modify his decision and to find that they had the right to dissolve the partnership and continue the business in accordance with the Partnership Agreement "and in accordance with section 9–609(b)(2) of the" UPA. Later, in papers filed with the arbitrators, the Berman Partners again revealed their view of the applicable law when they said that unless the arbitrator found that Goldstein was a defaulting partner under the Agreement (i.e., had breached the Agreement) the entire arbitration exercise would have accomplished nothing (except to eliminate Goldstein's "bogus" counterclaim).

### 3. Other "Wrongful Conduct" Equals "In Contravention"

A third view of the meaning of the "in contravention" language was set forth in Vol. II, *Bromberg and Ribstein on Partnerships,* pages 7.67—7.69 (1999—2 supplement).[7] Substituting again the Maryland Code references for the UPA references in the text, the authors articulate a third construction of the term "in contravention" in the emphasized portion of the following passage:

> *When is Dissolution or Dissociation Wrongful or In Contravention?*
>
> \* \* \*
>
> Interpretation problems are raised by the characterization of causes in U.P.A. § [9–602] as "in contravention" and "without violation" of the partners' agreement, and by the

---

7. For other discussions of this "third view" see, Robert W. Hillman: *The Dissatisfied Participant in the Solvent Business Venture: A Consideration of the Relative Permanence of Partnerships and Close Corporations;* 67 Minn. L.Rev. 1, 16, note 49 (1982); Alan Bromberg, 43 *Partnership Dissolution—Causes, Consequences and Cures* Tex. L.Rev. 631, 638–39 (1965), and *Hillman, supra,* 78 Nw. L.Rev. 538.

conditioning of the remedies under U.P.A. § [9–602(b)] on whether the dissolution is "in contravention." In the first place, a dissolving act may be in contravention of the partnership agreement and yet not be within § [9–602(2)]. For example, even if the agreement provides that the failure to meet a capital call causes dissolution "by express will" within the meaning of § [9–602(2)], because the recalcitrant partner did not express a desire to terminate the partnership. Thus, there is question whether this conduct triggers the remedies under U.P.A. § [9–609(b)]. In order to eliminate this potential confusion and to ensure that the agreement controls what causes are in contravention of the parties' agreement, ... [a Georgia statute] has eliminated the distinction in U.P.A. § [9–602] between causes that are and are not in contravention of the agreement.

A second interpretation problem under .U.P.A. §§ [9–602(2) and 9–609(b)] involves the question whether dissolution by judicial decree based on the wrongful conduct of the parties is dissolution "in contravention" and therefore triggers the remedies under § [9–609(b)]. Because § [9–609(b)] is linked to dissolution under § [9–602(2)], a dissolution under § [9–602(b)] (judicial decree) would arguably not trigger the § [9–609(b)] remedies. *On the other hand, no good reason appears for applying the § [9–609(b)] sanctions only to the particular kind of wrongful conduct— premature dissolution by express will—referred to in § [9– 609(b)]. Moreover, "wrongfully" and "in contravention" are used interchangeably in § [9–609(b)], and the bases of dissolution by court decree for partner misconduct usually involve violation of the partnership agreement. Several courts have wisely held that dissolution by judicial decree based on a partner's wrongful conduct triggers the § [9– 609(b)] remedies.*

\* \* \*

(Footnotes omitted.)

The authority cited by Bromberg and Ribstein for the emphasized sentences in the above passage was set forth in footnote 46, which read:

*Zieback [Zeibak] v. Nasser,* 12 Cal.2d 1, 82 P.2d 375 (1938) (partner's objection to agreed incorporation and refusal to pay share of deficit and to cooperate in other ways characterized by trial court as prejudicially affecting the carrying on of the business and making it impracticable to carry on the business with the partner); *Monteleone v. Monteleone,* 147 Ill.App.3d 265, 100 Ill.Dec. 859, 497 N.E.2d 1221 (1986); *Ohlendorf v. Feinstein,* 636 S.W.2d 687 (Mo. App.1982) (partner attempted to appropriate partnership opportunity and said the partnership was "dead"); *Dow v. Beals,* 149 Misc. 631, 268 N.Y.S. 425 (1933) (defendant excluded plaintiff from business); *Drashner v. Sorenson,* 75 S.D. 247, 63 N.W.2d 255 (1954) (partner neglected business and frequented bars during business hours).

*Id.* at 7:68–69.

*Monteleone v. Monteleone,* 147 Ill.App.3d 265, 100 Ill.Dec. 859, 497 N.E.2d 1221 (1986), which is cited in footnote 46, is the only case cited by appellees in their brief to support the assertion that they had a right to proceed under section 9–609(b). *Monteleone* is the leading case standing for the proposition that remedies available under UPA section 38(2) (i.e., section 9–609(b)) may be available when an "at-will" partnership is dissolved. This view, however, has not been widely adopted. *See* Rodney M. Confer & Cheryl Z. Wart, *Partnership Symposium, "Disintegration Erosion" of Fiduciary Duty in the Dissolution of a Partnership at Will,* 70 Neb. L.Rev. 107, 120 (1991).

In *Monteleone,* the "innocent partners" alleged in a counterclaim that the "guilty party" had (1) misappropriated partnership funds; (2) failed to contribute to the operation of the business; (3) made a "wrongful" demand that his son be made a partner in the business; (4) made a "wrongful" demand that a certain employee be fired; (5) refused to return certain partnership books and records; and (6) made draws in excess of his percentage of ownership in the partnership. *Id.* 100 Ill.Dec. at 861, 497 N.E.2d at 1223. The *Monteleone* Court held that, assuming the truth of the allegations in the counterclaim, the "innocent partners" had a right to continue the

partnership business under section 38(2)(b) of the Uniform Partnership Act (the counter part to section 9–609(b) of the UPA). *Id.* 100 Ill.Dec. at 862, 497 N.E.2d at 1224.

The *Monteleone* Court further noted that the "innocent partners" had alleged, in substance, that the "guilty" party had violated the partnership agreement in several specific respects and that these allegations were sufficient to state a claim that their partner's behavior "was in contravention of the partnership agreement or a breach of the partner's fiduciary duties, and would amount to 'wrongful termination' of the partnership." *Id.* 100 Ill.Dec. at 863, 497 N.E.2d at 1225. The Court further said that proof of a wrongful termination of a partnership is sufficient to allow dissolution of the partnership and to recognize the rights of the "innocent" partners to continue operation of the business under section 38(2) (i.e., section 9–609(b) of the UPA). *Id.*

Lastly, the *Monteleone* Court said, in *dicta*, that a partner's conduct is considered "wrongful" (within the meaning of section 38(2) (section 9–609(b) of the UPA)) when it is taken in "derogation of duties imposed either explicitly by the partnership agreement *or implicitly by virtue of the nature of the partnership itself.*" *Id.* 100 Ill.Dec. at 862, 497 N.E.2d at 1224 (emphasis added).

Although the matter need not be decided, the case *sub judice* can probably be distinguished from the *Monteleone* case on the basis of several factual differences, the most important being that here Goldstein did not breach any of the express terms of the partnership agreement. Nevertheless, *dicta* in the *Monteleone* case does support the trial judge's interpretation of section 9–609, as does the holding in *Zeibak v. Nasser*, 12 Cal.2d 1, 82 P.2d 375 (1938), and *G & S Investments v. Belman*, 145 Ariz. 258, 700 P.2d 1358, 1362 (1984).

■ Scholars could profitably engage in an all-day symposium discussing which of the three views of the UPA correctly interpret the "in contravention" language set forth in section 9–609. But here, the issue is not which of the three views is

correct. The question to be resolved is: What interpretation did the arbitrator give to section 9–609?

The arbitrator was a lawyer well versed in the intricacies and nuances of the UPA. He undoubtedly understood the statutory construction problem discussed above because one of the central points that the Berman Partners sought to prove in the arbitration proceeding was that they had a right to continue the partnership's business without the participation or presence of Goldstein. Although the arbitrator did not say so explicitly, it is clear from the negative implications that must be drawn from his rulings that he did not consider Goldstein to have acted "in contravention of the agreement" as that phrase is used in section 9–609. Even if the arbitrator was wrong in his interpretation of the law, it would be too late now to second guess or otherwise overturn the arbitrator's ruling—since the arbitrator's award has already been confirmed by an enrolled judgment. *See also Southern Md. Hospital v. Edward M. Crough, Inc.,* 48 Md.App. 401, 407, 427 A.2d 1051 (1981).

To discern the arbitrator's view of the law, we must examine what the appellees asked the arbitrator to do and how the arbitrator ruled on their requests. After appellees had already won the right to dissolve the partnership by virtue of the original award, the appellees asked the arbitrator for the right to continue the business of the partnership "in accordance with section 14.2" of the Agreement "and in accordance with section 9–609(b)(2)" of the UPA. That request was explicitly denied by the arbitrator on August 25, 1997. If the arbitrator had harbored the belief that a dissolution caused by actions listed in section 9–603(4) or (6) was "wrongful" or "in contravention of the agreement," he would have had no possible alternative but to grant the Berman Partners' request to continue the partnership in "accordance with section 9–609(b)(2)" of the UPA.

The trial judge, in his written opinion granting appellees' motion for summary judgment and motion to dismiss, makes no mention of the fact that the arbitrator explicitly denied

appellees the right to continue the partnership business. Moreover, in their brief, appellees make no effort to explain (or circumvent in any way) the arbitrator's explicit denial of the right to continue the business even though this was one of the central points raised in Goldstein's brief.

We hold, based on the arbitrator's decision, that appellees had no right to wind up the affairs of the Joint Venture in accordance with section 9–609(b); instead, as Goldstein's lawyer pointed out to counsel for appellees in his letter of November 4, 1997, appellees were required to dissolve the partnership in accordance with section 9–609(a). Therefore, the trial judge erred in granting summary judgment in favor of appellees and in dismissing Goldstein's cross-petition to enforce consent order and judgment confirming arbitration award.

### B. *Appointment of a Receiver*

■ The parties have been at odds for over two years as to whether the partnership must be dissolved under section 9–609(a) or (b). Now that this issue has been resolved, the question arises as to what steps the trial court should take upon remand.

Section 9–609(a) provides that "unless otherwise agreed" a partner may have "the partnership property applied to discharge . . . [the partnership] liabilities, and the surplus applied to pay in cash the net amount owing to the respective parties." In other words, that provision, as applied to this case, means that Goldstein has a right to have the assets of the partnership liquidated. To this end, Goldstein asks us to order the trial court to appoint a receiver to handle the details of winding up the partnership and selling the assets. The appellees oppose the appointment of a receiver—although they do not say what other mechanism they contend the court should utilize to liquidate the partnership's assets.

In *Lust v. Kolbe*, 31 Md.App. 483, 489–90, 356 A.2d 592 (1976), Judge Gilbert (later Chief Judge) said for this Court:

As a general rule, the appointment of a receiver is a matter resting within the sound discretion of the equity court. The discretion, however, is neither arbitrary nor absolute. IV J. Pomeroy, *A Treatise on Equity Jurisprudence* § 1333 (5th ed.1941). It must be "... exercised with great circumspection...." *Howeth v. Coulbourne Bros.*, 115 Md. 107, 121 [80 A. 916] (1911).

\* \* \*

... Pomeroy § 1333, at 927, states:

"In suits for a dissolution or winding up of a partnership, and even in some very special cases without a dissolution, the court may appoint a receiver of the firm assets, when there is any misconduct on the part of the defendants, and even, perhaps, where the partners themselves are wholly unable to agree as to the management of the property and the settlement of the partnership affairs. *The jurisdiction is, however, always exercised with great carefulness and caution.*"

A receiver appointed by the court is an officer of the court charged with the duty of receiving, collecting, caring for, administering, and disposing of the property of another "... under the orders of court...." 1 R. Clark, *A Treatise on the Law and Practice of Receivers* § 11(a)(3d ed.1959). "A receiver is not a trustee." 1 Clark § 43, at 43. A receiver assumes no express or definite trust and only obeys the orders of the court which he represents. The powers of a receiver are not usually fixed by law alone but rather by the order of appointment. 1 Clark § 43, at 44. "Receivers are not strictly speaking trustees ... because ordinarily without special statute receivers do not take title to the property. They do not derive their power and authority from the deed of trust or other agreement, but they derive their authority from the court." 1 Clark § 43(a), at 45....

We have no doubt that the trial court *could* appoint a receiver in this case to liquidate the partnership's assets. And, it may well come about that there is no other feasible

alternative except to appoint a receiver. But, at this stage, we are loathe to order that a trustee be appointed because, as discussed in *Lust, supra,* this is a matter that lies in the sound discretion of the trial court. *Lust,* 31 Md.App. at 489, 356 A.2d 592.

Although Goldstein does not get along with his partners, it is at least conceivable that they will agree to some remedy short of liquidation now that it has been decided that section 9–609(a) is applicable. Section 9–609(a) does not require liquidation if the parties agree otherwise. It might well be economically ruinous, or at least very expensive, for the Berman Partners to liquidate. On the other hand, if Goldstein were immediately paid his developer's fee plus the relatively minuscule value of his share of the partnership, some accommodation short of liquidation might be reached. We will leave it to the good judgment of the trial court to work out the mechanics of the dissolution.

### D. Attorneys' Fees

■ Section 3–228 of the Courts and Judicial Proceedings of the Maryland Code (1998 Repl.Vol. & Supp.1999) provides:

(a) *Entering of Judgment; enforcement of judgment.—* (1) If an order confirming, modifying, or correcting an award is granted, a judgment shall be entered in conformity with the order.

(2) The judgment may be enforced as any other judgment.

(b) *Costs and Disbursements.*—A court may award costs of the petition, the subsequent proceedings, and disbursements.

The term "disbursements" as used in section 3–228 includes reasonable attorneys' fees at both the trial and appellate level. *Blitz v. Beth Isaac Adas Israel Congregation,* 352 Md. 31, 47, 720 A.2d 912 (1998).

Goldstein's counsel argues:

Goldstein has been compelled to institute this proceeding and to prosecute this appeal solely because of the intransi-

gence of the Berman Partners, who unjustifiably refuse to abide by the arbitrator's award. He is, accordingly, entitled to be reimbursed for his reasonable attorney's fees both in connection with the initial circuit court proceedings, this appeal, and any proceedings upon remand.

■ In regard to the award of cost and disbursements, it is to be noted that the Maryland version of the Uniform Arbitration Act ("MAA"), section 3–229(b), uses the permissive "may," i.e., "The court *may* award costs of the petition," etc. (Emphasis added.) Other courts construing provisions identical to section 3–228(b) have ruled that the allowance of attorneys' fees lies "within the discretion of the court." [8] *See County of Clark v. Blanchard Construction Comp.*, 98 Nev. 488, 653 P.2d 1217, 1220 (1982) (Nev. Supreme Ct., 1982); *Wachtel v. Shoney's, Inc.*, 830 S.W.2d 905, 909 (Tenn.App., 1991). As pointed out by the Court of Appeals in *Blitz*, when construing the Uniform Arbitration Act, maintaining standardized construction of the Uniform Act carries out the legislative intent of the General Assembly. 352 Md. at 43–44, 720 A.2d 912. We are in accord with our sister states and hold that the trial court is entitled to exercise its discretion in deciding whether to award attorneys' fees to Goldstein under section 3–228.[9] Thus far,

---

**8.** A Maryland statute written somewhat similarly to section 3–228 of the MAA has been construed as permissive. The Maryland Consumer Protection Act uses language similar to that found in the Maryland Arbitration Act. In pertinent part, it provides:

(a) in addition to any action by the Division or Attorney General authorized by this title and any other action otherwise authorized by law, any person may bring an action to recover for injury or loss sustained by him as the result of a practice prohibited by this title.

(b) *Any person who brings an action to recover for injury or loss under this section and who is awarded damages may also seek, and the court may award, reasonable attorney's fees.*

Md.Code Ann., Com. Law. II § 13–408 (1990 Repl.Vol.) (emphasis added). That language has been construed as permissive. *See Richwind Joint Venture 4 v. Brunson*, 335 Md. 661, 682, 645 A.2d 1147 (1994) (holding that section 13–408 "authorized a private cause of action for recovery of damages, and possibly attorney fees at the discretion of the court.").

**9.** *Buzas Baseball, Inc. v. Salt Lake Trappers, Inc.*, 925 P.2d 941, 952 (Utah Supreme Court, 1996), provides a discussion of the factors that

the trial court has not had an opportunity to exercise discretion in this regard. Upon remand, the court should do so.

**JUDGMENT REVERSED; CASE REMANDED TO THE CIRCUIT COURT FOR BALTIMORE COUNTY FOR FURTHER PROCEEDINGS IN ACCORDANCE WITH THE VIEWS EXPRESSED IN THIS OPINION; COSTS TO BE PAID BY APPELLEES.**

should be weighed in the exercise of the court's discretion in regard to an award of attorneys' fees incurred in seeking to enforce an arbitration award. The Utah statute contains language slightly different from that found in section 3–228. Section 78–31a–16 of the Utah Code Ann. provides: "Costs incurred incident to any motion authorized by this chapter, including a reasonable attorney's fee, unless precluded by the arbitration agreement, *may* be awarded by the court." (Emphasis added.) Nevertheless, section 78–31–16 is substantively the same as Maryland Code (1974, 1995 Repl.Vol.), section 3–228(b) of the Courts and Judicial Proceedings Article, and therefore we believe it contains useful guidance.