748 A.2d 24

**CITIBANK FEDERAL SAVINGS BANK, et al.**

v.

**NEW PLAN REALTY TRUST, et al.**

**No. 635, Sept. Term, 1999.**

Court of Special Appeals of Maryland.

March 9, 2000.

---

46

**48**

Darin S. Levine, (Richard A. Kramer and Kramer & Gorney, Chartered, on the brief), La Plata, for appellants.

Bruce L. Marcus, (M. Celeste Bruce and Marcus & Bonsib, on the brief), Greenbelt, for appellees.

Argued before HOLLANDER, EYLER and THIEME, JJ.

THIEME, Judge.

Appellant, Citibank Federal Savings Bank ("Citibank"), appeals from an order of the Circuit Court for Montgomery County denying its exceptions to a sheriff's sale.[1] In its exceptions, Citibank requested that the court set aside the sale or, in the alternative, find that Citibank is the holder of a partial superior lien to appellee, New Plan Realty Trust ("New Plan"), by virtue of the doctrine of equitable subrogation. After a hearing, the court adopted New Plan's arguments and denied Citibank's exceptions. Citibank presents the following questions for our review, which we have renumbered and rephrased for clarity:

1. Did the court err in ratifying the execution sale when the sheriff permitted a judgment creditor to apply credit toward the deposit and purchase price even though the notice of sale specified that the deposit must be paid in cash or with a certified check payable to the sheriff?

2. Did the court err in ratifying the execution sale when an individual was not permitted to bid with a cashier's

---

1. The terms "sheriff's sale" and "execution sale" are used interchangeably in this opinion.

check or a certified check payable to herself, which she offered to indorse to the sheriff?

3. Did the court err in failing to address Citibank's equitable subrogation claim in its order?

4. Did the court err in failing to find that Citibank held a partial superior lien against the property?

We answer "no" to the first question and "yes" to the second question. We do not reach the third and fourth questions.

## Facts

On January 24, 1974, Todd Realty Corporation ("Todd"), a Maryland corporation, purchased in fee simple the real property located at 7300 Helmsdale Road in Bethesda, Maryland. On April 25, 1991, Todd conveyed its interest in the property by deed to Robert I. Melnick and his sons, Scott L. Melnick, Richard J. Melnick, Gary N. Melnick, and Matthew R. Melnick, who were all of the original shareholders of Todd. Also on April 25, 1991, the shareholders executed a deed of trust in the amount of $500,000.00 for the benefit of Citibank ("Citibank deed of trust") to secure a promissory note of the same date for the same amount. The Citibank deed of trust was recorded on June 17, 1991, in the Land Records of Montgomery County, Maryland.

The Citibank deed of trust stated on its face that it was a refinance of a prior deed of trust recorded in the Land Records with a balance of $215,370.54. The proceeds of the Citibank deed of trust were used to the extent of $215,370.54 to pay in full the prior deed of trust. The prior deed of trust was released by an affidavit of satisfaction recorded on June 26, 1991.

Appellee, New Plan Realty Trust ("New Plan"), is a judgment creditor of Robert I. Melnick by virtue of a judgment enrolled in the Circuit Court for Montgomery County. Judgment was entered on May 10, 1982, and docketed on or about May 19, 1982. As of the date of judgment, Robert I. Melnick was indebted to New Plan in the amount of $431,143.00. According to New Plan, with the accumulation of interest, the

amount of the judgment, interest, and costs was "well in excess" of $900,000.00 as of the filing date of New Plan's brief in this Court.

During the course of its attempts to satisfy the judgment, New Plan discovered that Robert I. Melnick resided in a home located at 7300 Helmsdale Road, Bethesda, Maryland, which was titled in the name of Todd Realty Corporation. In April 1991, New Plan instituted ancillary proceedings asserting that Todd was a sham corporation having conducted or transacted no business, filed no tax returns and owned no property other than the Melnick home. Thus, New Plan argued, "for all purposes, [Todd] was the alter ego of Robert I. Melnick." New Plan also learned that Todd purported to have been dissolved and conveyed its sole asset, the Helmsdale property, on June 17, 1991, by recording the previously described Citibank deed of trust.

New Plan filed suit in the Circuit Court for Montgomery County and sought to set aside the deed, described as a no-consideration deed, as a fraudulent conveyance. On August 16, 1995, the jury determined that Robert I. Melnick intended to perpetrate fraud by causing Todd Realty to convey the property to himself and his sons. The jury further found that Todd was a straw and that the real party in interest to Todd was Robert I. Melnick. As a result of the jury's special verdict, the court rendered a decision finding that the transaction and conveyance from Todd to the Melnicks was a fraudulent conveyance.

Thereafter, no appeal having been noted, New Plan requested that the Sheriff for Montgomery County seize the property and sell it pursuant to the judgment lien enrolled on May 19, 1982. As of July 26, 1996, when New Plan requested the sheriff's sale, the judgment totaled approximately $939,829.00. The Sheriff for Montgomery County seized the property pursuant to the writ of execution of property obtained by New Plan.

Prior to the sheriff's sale, however, Citibank attempted to foreclose on the property. As noted in the report of sale, the

property was sold on November 12, 1996, to third-party purchasers Thomas G. Tsianakas and Loanna Stagia Tsianakas for a high bid of $513,500.00. New Plan filed exceptions to the foreclosure sale and the ratification of the foreclosure proceeding.

After a hearing, the court issued an order on April 22, 1997, stating that New Plan's judgment had priority over Citibank's lien and that Citibank was not an innocent grantee. The order further directed that the property be sold subject to New Plan's lien. Citibank appealed to this Court and we affirmed the trial court's judgment.

The sheriff's sale was eventually scheduled for January 22, 1998, at 10:30 a.m. According to the terms of the notice of sale, a $5,000.00 deposit was required at the time of the sale, with the balance of the purchase price due within ten days after ratification from the court. The advertisement further provided that both the deposit and the remaining balance be paid in U.S. currency or certified check made payable to "Sheriff of Montgomery County."

The property was sold at the sheriff's sale to New Plan for $500,000.00. New Plan was the only party to place a bid at the sale. Citibank filed exceptions to the Report of Sale on March 12, 1998, arguing that ratification should be denied due to various irregularities in the conduct of the sale. In addition, Citibank contended that under the doctrine of equitable subrogation Citibank had a partial first lien on the proceeds from any sale of the subject property. New Plan filed a response to Citibank's exceptions, and a hearing was held on July 9, 1998. The court adopted the arguments New Plan set forth in its response and denied Citibank's exceptions.

## Discussion

Citibank raises two arguments on appeal. First, it argues that the sheriff's sale should not have been ratified due to irregularities in the conduct of the sale. Second, Citibank contends that the doctrine of equitable subrogation operates in

this case to give Citibank a first priority lien on the property at issue. We will discuss these arguments in turn.

*Sheriff's Sale*

*A. New Plan's Bid*

■ In bidding on the property at the sheriff's sale, New Plan did not provide a deposit in the manner required by the notice of sale. Instead, New Plan applied its judgment to provide the deposit and pay the balance due and owing (within the required ten days). Citibank argues that, because this method of payment was not explicitly permitted by the notice of sale, accepting payment in this manner amounted to an irregularity that warrants setting aside the sale. We disagree.

■ According to Citibank's argument, New Plan should have paid the deposit in the form of cash or a cashier's check made payable to the sheriff and then paid the balance to the sheriff within ten days. After the auditor's report had been filed and ratified by the court, the sheriff would then have issued a check to New Plan in the amount of $500,000.00. Thus, New Plan would simply have paid itself the purchase price of $500,000.00. We do not subscribe to this circular approach, and instead adopt the view of the Court of Appeals in *Van Wagoner v. Nash,* 187 Md. 410, 416, 50 A.2d 795 (1947):

> [Where the] claim of the purchasers was preferred, and it was much greater than the amount of the proceeds of the sale ... it would have been a very useless—to say nothing of a senseless—ceremony, to have required the purchasers to pay over the money that the court had adjudged to belong to them, in order that the trustee might go through the form of paying it back.

■ It is well-settled in Maryland that a mortgagee may purchase the mortgaged property at a foreclosure sale by applying the mortgage debt to the purchase price, rather than by paying with cash or a certified check. *See, e.g., Van Wagoner,* 187 Md. 410, 50 A.2d 795; *Weismiller v. Bush,* 56 Md.App. 593, 598, 468 A.2d 646 (1983). In *Weismiller,* this

Court stated that "Maryland law has long and consistently permitted a mortgagee who purchases the mortgaged property at a foreclosure to apply the debt due him by the mortgagor against the purchase price, to the same effect as if he had posted or paid cash in that amount." 56 Md.App. at 598, 468 A.2d 646 (footnote omitted). The Court then reviewed numerous Maryland cases spanning over 130 years that supported its conclusion. *Id.* at 598–99, 468 A.2d 646 (reviewing *Murdock's Case*, 2 Bland 461, 468 (1828); *Lannay's Lessee v. Wilson*, 30 Md. 536 (1869); *Harnickell v. Orndorff*, 35 Md. 341 (1872); *Moss v. Annapolis Savings Institution*, 177 Md. 135, 8 A.2d 881 (1939); *Van Wagoner v. Nash*, 187 Md. 410, 50 A.2d 795 (1947); *Woelfel v. Tyng*, 221 Md. 539, 158 A.2d 311 (1960)).

Relying in part on *Weismiller*, the United States Bankruptcy Court for the District of Maryland held that, "[i]n Maryland, a mortgagee who 'buys in' the property at a foreclosure is entitled to have the amount of its bid augmented by any deficiency resulting from the sale which it waived." *In re Brown*, 126 B.R. 481, 485–86 (March 28, 1991); *see also Garland v. Hill*, 28 Md.App. 622, 346 A.2d 711 (1975).

Although these cases establish that a mortgagee may purchase the mortgaged property at a foreclosure sale by applying the mortgage debt to the purchase price, Maryland has yet to determine whether a judgment creditor may apply the judgment debt when purchasing the debtor's property at an execution sale. While the analysis may be similar or even identical, arguably a mortgagee has a stronger claim to the property subject to the mortgage than a judgment creditor has to property that, while owned by the debtor, may or may not be related to the judgment. Thus, we will address the issue *sub judice* beyond merely extending our established foreclosure sale analysis into the context of execution sales. As we explain more fully in the following discussion, we hold that the judgment creditor may bid on and purchase property at an execution sale by applying the judgment debt toward the purchase price.

While it may be customary in this state for judgment creditors to bid their judgments rather than cash or a certified check at an execution sale, as we have noted, Maryland has not explicitly addressed this issue. There is, however, ample case law from numerous other jurisdictions holding that judgment creditors at a sheriff's sale need not purchase the debtor's property by presenting cash or a certified check, as long as the amount of the judgment debt equals or exceeds the purchase price.

In New York, for example, "[w]here an execution creditor bids at a sheriff's sale and the goods are struck off to him, the sheriff may lawfully deliver the goods without receiving the money, as it would be unreasonable to insist that the creditor in execution should advance money on his bid when the sole object of the sale was to pay the debt to him." *Nichols v. Ketcham*, 19 Johns. 84, 1821 WL 1575 (N.Y.Sup.1821). Other states adopting this approach include Arkansas, California, Florida, Indiana, Iowa, Michigan, North Carolina, Oregon, Pennsylvania, South Carolina, Texas, and Utah. *See, e.g., Troutman v. Erlandson*, 69 Or.App. 310, 317, 685 P.2d 473 (1984) (judgment creditor "was entitled to bid portions of his judgments on the cash sales price") (citing *Title & Trust Co. v. Security Buildings Corp.*, 131 Or. 648, 651, 284 P. 177 (1930) ("The judgment creditor may waive the payment of the bid and receipt for the purchase money without the payment in cash. And the useless ceremony of handing money to the sheriff and then receiving it back from him, where the judgment creditor is purchaser, is not necessary.")); *Flagship State Bank v. Carantzas*, 352 So.2d 1259, 1262 (Fla.Dist.Ct. App.1977), *cert. denied*, 361 So.2d 830 (1978) ("As a general rule, an officer at an execution sale must sell the property bid for cash and has no right to sell for credit, with the exception of a sale made to the judgment creditor who may credit the amount of his debt."); *Prudential Corp. v. Bazaman*, 512 S.W.2d 85 (Tex.Civ.App.1974) ("Where the judgment creditor becomes the purchaser at the sale, the judgment creditor may apply the amount of his bid as a credit on the judgment."); *Petrie v. General Contracting Co.*, 17 Utah 2d 408, 412, 413-

P.2d 600 (1966) (Callister, J., dissenting) ("The fact that the judgment creditor does not tender the cash to the sheriff (if the bid is in the amount of the judgment, or less) is irrelevant and in no way alters the character of the transaction as a sale of property purchased with cash.") (citing *Turner v. Donovan,* 64 Cal.App.2d 375, 148 P.2d 912 (1944) (it is not essential to the validity of an execution sale to a judgment creditor that cash pass back and forth between the sheriff and the creditor)); *Houck v. Houck,* 25 Pa. D. & C. 701, 1935 WL 5126 (Pa.Com.Pl.) (1935) (where purchaser of real estate at sheriff's sale is lien creditor, it is not necessary for him to pay full purchase price to sheriff, but sheriff can receive receipt from him for such amount of proceeds as he would be entitled to); *Baker v. West,* 120 Tex. 113, 120, 36 S.W.2d 695, (1931) (citing *Blum v. Rogers,* 71 Tex. 668, 677–78, 9 S.W. 595, (1888) (Where the plaintiff in an execution levied on land becomes the purchaser at the sale, the sheriff need not "exact payment from him in coin ... when he is clearly entitled to the proceeds of the sale.... It would be an idle ceremony if the plaintiff, on buying at a sale for his benefit, should be required to actually hand over to the sheriff the money, to be returned at once.")); *Silver v. Wickfield Farms,* 209 Iowa 856, 227 N.W. 97, 100 (1929) (The law does not require that a judgment creditor, as purchaser at an execution sale, pay money "over to the sheriff, to be by him immediately returned."); *Needham v. Cooney,* 173 S.W. 979, 982 (Tex.Civ.App.1915) (citing *Small v. Small,* 16 S.C. 64, 1881 WL 5947 (1881); *Thorpe v. Beavans,* 73 N.C. 241 (1875)); *Munger v. Sanford,* 144 Mich. 323, 107 N.W. 914 (1906); *Boots v. Ristine,* 146 Ind. 75, 44 N.E. 15, 16 (1896) (where creditor purchases at the execution sale, he is entitled to have the payment of his debt, evidenced by his receipt, credited as a payment on his bid in lieu of cash, where there is no question that his debt is a first lien on the purchase price); *Fowler v. Pearce,* 7 Ark. 28, 1846 WL 572 (1846) ("Where a plaintiff bids at a sale of property under his own execution, it has been held to be unreasonable 'to insist that he should advance money on his bid when the sole object of the

sale is to put money in his hands by paying a debt due to him.' ").

Each of these states permits judgment creditors to apply the judgment debt toward the purchase price of the property at an execution sale. Judgment creditors are only required to pay cash (or certified checks) for the costs of the execution sale, itself, and to satisfy any portion of the purchase price not covered by the judgment debt. We agree with the rationale set forth in these other jurisdictions that requiring a judgment creditor to pay cash or tender a certified or cashier's check at an execution sale in these circumstances is an exercise in futility. Even when the notice of sale specifies that the deposit and/or the final payment must be in cash or certified check, an exception may be made for a judgment creditor, who may apply the amount of the judgment toward the purchase price of the property at an execution sale.

In this case, New Plan had a valid judgment in excess of $900,000.00 against Robert I. Melnick at the time of the execution sale. New Plan bid a portion of its judgment, $500,000.00, on the property owned by Melnick. We find that this method of payment was acceptable, regardless of whether it was expressly provided for in the notice of sale. Therefore, New Plan's failure to provide cash or a certified check for the $5,000.00 deposit at the sale did not constitute an irregularity warranting the invalidation of the sale.

### B. Sheriff's Refusal to Accept Third–Party Bid

■ Besides New Plan, a third party was present at the sheriff's sale and attempted to bid. For the reasons explained below, the sheriff did not permit this individual to bid. Citibank contends that this irregularity bars ratification of the sale. We agree.

Before we address the substance of Citibank's argument, we first note that the identity of the individual, as well as the manner in which she attempted to pay the deposit at the sale, is unclear from the record. In its brief to this Court, Citibank contends that Ms. Minh–Vu Hoang, an investor representing a

partnership with Mr. and Mrs. Tsianakas, the third-party purchasers at the Citibank foreclosure, was present at the sale. Citibank states that Ms. Hoang "attempted to place a higher bid than New Plan for $501,000.00, but the sheriff refused her bid." The only evidence of Ms. Hoang's attempt to place a bid $1,000.00 higher than New Plan's is her own affidavit, which is part of the record in this case.

In her affidavit, Ms. Hoang stated that when she arrived at the sale she "tendered to the sheriff a *certified check* issued by Citizen's Bank (currently known as Provident Bank) in the amount of $5,000.00 that was made payable to myself. I offered to [i]ndorse the check over to the sheriff for use as a deposit." (emphasis added).

Also in the record, however, is an affidavit of Mr. Richard Kramer, counsel to Citibank, filed as Exhibit 8 to Citibank's exceptions to the sheriff's sale. Mr. Kramer stated that he was present at the sheriff's sale on January 22, 1998, and that the other person present identified herself as Mrs. Tsianakas (not Ms. Hoang). She attempted to register as a bidder but was rejected by the sheriff. Mr. Kramer further asserted that Mrs. Tsianakas "had with her a *cashier's check* in the sum of $5,000.00 payable to herself which she offered to [i]ndorse to the sheriff." (emphasis added). In addition, Mr. Kramer stated that Mrs. Tsianakas attempted to place a bid of $500,-001.00 on the property, but that the sheriff refused her bid. The only evidence in the record that Mrs. Tsianakas attempted to place a bid $1.00 higher than New Plan's is Mr. Kramer's affidavit.

 On appeal, neither party raises a substantive issue regarding the identity of the refused bidder. We will therefore assume that the bidder, whoever she was, was the same person named as the payee on the instrument that she attempted to tender to the sheriff. Thus, the only issue before this Court is whether Mrs. Tsianakas/Ms. Hoang should have been permitted to register and bid at the sheriff's sale when the cashier's check/certified check in her possession was not made payable to the sheriff, as required by the notice of sale.

[T]he object of certifying a check is to make it equivalent to, and a substitute for, money; the check, as a consequence of certification, becomes a reliable basis of credit and enables the transferee to take it with the same readiness with which he would take the notes of the bank.

11 Am.Jur.2d *Banks and Financial Institutions* § 922 (1997). Indeed, "[t]he bank's certification of a check constitutes acceptance and is the bank's signed engagement to pay the check on presentment when properly indorsed." 12 Am.Jur.2d *Bills and Notes* § 442 (1997). As the Court of Appeals noted in *National Bank of Commerce v. Baltimore Commercial Bank,* 141 Md. 554, 556, 118 A. 855 (1922), "by certification, a bank enters into an absolute undertaking to pay the check or draft when presented . . . [except] where such certification is made by mistake, such mistake may be corrected so long as the rights of third persons have not intervened."

Similarly, a "cashier's check is accepted by the act of issuance and becomes an irrevocable obligation of the issuing bank." 12 Am.Jur.2d § 442 (1997). When a bank issues a cashier's check in return for the customer's check, "issuance of the cashier's check represent[s] both a promise to pay the [customer's] check and payment of the check." *Rezapolvi v. First Nat. Bank of Maryland,* 296 Md. 1, 6, 459 A.2d 183 (1983).

New Plan argues that the sheriff's refusal to accept Ms. Hoang's/Mrs. Tsianakas's bid was merely "a valid precondition imposed by the Sheriff for prospective bidders" that "no third party checks be used as a deposit." In *Buckeye Dev. Corp. v. Brown & Shilling, Inc.,* 243 Md. 224, 230, 220 A.2d 922 (1966), the Court of Appeals recognized that the sheriff at an execution sale is "entrusted with a certain amount of discretion in conducting" the sale. In light of that discretion, we agree with New Plan's contention that refusing to accept third-party checks would ordinarily be a valid precondition imposed on prospective bidders. In this case, however, Ms. Hoang's/Mrs. Tsianakas's bid should not have been

refused on that basis, as the instrument she tendered to the sheriff was not a third-party check.

 "When a check is certified, it *ceases to possess the character or to perform the functions of an ordinary check*; it represents so much money on deposit, payable to the holder on demand." 11 Am.Jur.2d *Banks and Financial Institutions* § 925 (1997) (emphasis added). Likewise, "a 'cashier's check, purchased for adequate consideration, *unlike an ordinary check,* stands on its own foundation as an independent, unconditional and primary obligation of the Bank.'" *Rezapolvi,* 296 Md. at 8, 459 A.2d 183 (emphasis added) (citing *State of Pa. v. Curtiss Nat. Bank of Miami Springs, Fla.,* 427 F.2d 395, 400 (5th Cir.1970)). Moreover, as to cashier's checks, "'[t]he general rule [is] that the act of issuing a cashier's check *binds* the issuing bank to pay the instrument and the bank is not allowed to stop payment on it.'" *Id.,* 296 Md. 1, 459 A.2d 183 (emphasis in original) (citing *Anderson, Clayton & Co. v. Farmers Nat. Bank, Etc.,* 624 F.2d 105, 109–10 (10th Cir. 1980)). The Court further noted in *Rezapolvi:*

> [C]ourts have recognized and given effect to the public perception of a cashier's check. According to one court, "[a] cashier's check circulates in the commercial world as the equivalent of cash.... People accept a cashier's check as a substitute for cash because the bank stands behind it, rather than an individual."

296 Md. at 8–9, 459 A.2d 183 (citing *National Newark & Essex Bank v. Giordano,* 111 N.J.Super. 347, 268 A.2d 327 (1970)).

 In addition, we note that although the sheriff is accorded some discretion in conducting an execution sale, that discretion "must be fairly and impartially exercised for the benefit of all concerned." *Buckeye,* 243 Md. at 230, 220 A.2d 922. As the purpose of the sale "is to accomplish the satisfaction of the judgment, the sale should be so conducted as to promote competition and to secure the best price." *Id.* at 229–30, 220 A.2d 922. The sheriff's refusal to permit Ms. Hoang/Mrs. Tsianakas to register to bid after she presented an acceptable form of deposit did not promote competition.

While we have no way of knowing whether Ms. Hoang/ Mrs. Tsianakas would have ultimately placed the highest bid on the property, refusing to permit her to bid at all was certainly not designed to secure the best price at the sale.

Had the sheriff accepted Ms. Hoang's/Mrs. Tsianakas's indorsed check, he would have been in possession of a certified or cashier's check payable to him upon demand. Such a check does not lose its status as a "certified" or "cashier's" check, with all of the attendant protections merely by virtue of being indorsed to a third party (here, the sheriff) by the original payee. We hold that the sheriff's refusal to accept Ms. Hoang's/Mrs. Tsianakas's bid amounted to an irregularity warranting that the sale be set aside.

### Equitable Subrogation

Citibank's final argument is that its lien on the property should be a first priority lien, with New Plan's lien second in priority under the doctrine of equitable subrogation. Under this doctrine, " '[w]here a lender has advanced money for the purpose of discharging a prior encumbrance in reliance upon obtaining security equivalent to the discharged lien, and his money is so used, the majority and preferable rule is that if he did so in ignorance of junior liens or other interests he will be subrogated to the prior lien.' " *G.E. Capital Mortgage Services, Inc. v. Levenson*, 338 Md. 227, 231–32, 657 A.2d 1170 (1995) (citing G.E. Osborne, *Handbook on the Law of Mortgages* § 277, at 570 (2d ed.1970)). Citibank argues that, because the Melnick deed of trust was a refinance of the prior deed of trust, Citibank's mortgage has priority over New Plan's judgment, which was enrolled after the original deed of trust refinanced by Citibank.

At this stage in the proceedings, we decline to decide this issue. First, as we explain further below, the record is insufficiently developed for this Court to meaningfully review the claim. Second, while it may seem unlikely, the proceeds from the execution sale may be sufficient to satisfy Melnick's debts to both Citibank and New Plan, thus rendering moot the issue of equitable subrogation. Of course, if the proceeds of

the sale are not sufficient to eliminate the indebtedness, the equitable subrogation issue will become relevant. In that instance, following the sheriff's sale, the court must determine whether New Plan or Citibank has a first priority lien on the property. While we will not decide Citibank's equitable subrogation claim, we will address it in the interest of completeness and to provide guidance to the lower court, should the issue become relevant following the sheriff's sale.

Before we address this issue, however, it is necessary to revisit the procedural history of this case, which we have briefly discussed in the "Facts" section of this opinion. After Todd Realty purported to convey the subject property to Robert I. Melnick and his sons, the Melnicks obtained a loan from Citibank in the amount of $500,000.00, which was secured through a deed of trust on the property. Subsequently, the Melnicks defaulted on the loan and Citibank began foreclosure proceedings. Prior to foreclosure, New Plan filed suit to set aside the conveyance as fraudulent. The conveyance was set aside by order of the court, signed by the Honorable Michael D. Mason on June 11, 1996. The special verdict returned by the jury included the findings that Todd Realty was the alter ego of Robert I. Melnick, and that the conveyance was intended to defraud creditors by preventing New Plan's judgment from attaching to the property.

New Plan then filed exceptions to the foreclosure sale of the property. The exceptions were heard before the Honorable Nelson Rupp, Jr. In that proceeding, New Plan argued that when the conveyance was set aside as fraudulent title was conferred in Robert I. Melnick individually. Therefore, New Plan's 1982 lien attached to the property and took precedence over Citibank's 1991 lien. As a result, New Plan contended, Citibank's foreclosure sale of the property could not be ratified by the court and New Plan's exceptions to the sale had to be sustained. The issue before Judge Rupp was, therefore, whether New Plan's judgment attached to the property as a result of the fraudulent conveyance to the Melnicks. If New Plan's judgment attached, it would take precedence over Citibank's lien by virtue of having been enrolled before the

Citibank lien. Judge Rupp found that once the conveyance was set aside as fraudulent title reverted to Robert I. Melnick, the alter ego of Todd Realty, the fraudulent record title holder. Judge Rupp further held that New Plan's judgment attached to the property.

During this proceeding, Judge Rupp was not considering equitable subrogation as a means of elevating the priority of the Citibank lien. Rather, Citibank argued that, when the conveyance by Todd Realty to the Melnicks was set aside, title reverted to Todd Realty, and New Plan's judgment against Robert I. Melnick would not attach to the property at all. In a footnote, Judge Rupp noted that "Citibank is not an innocent grantee . . . as evidenced by various exhibits admitted by New Plan in this proceeding which reflect Citibank's treatment of Robert I. Melnick, instead of Todd Realty, as the sole owner of the residence for which Citibank executed a $500,000 no-documentation loan." In affirming Judge Rupp's opinion and order, this Court stated that Judge Rupp "was not clearly erroneous in finding that Citibank was on inquiry notice of the fraudulent conveyance and was not therefore an 'innocent' grantee." *Oosterhout, et al. v. Melnick, et al.*, No. 1182, September Term, 1997 (unreported).

In its brief to this Court, New Plan argues that, "[s]ince this Honorable Court has previously acknowledged that [Citibank] was on inquiry notice, [Citibank] is deemed to have had actual knowledge of the intervening lien of [New Plan]." Judge Rupp's opinion does not support this leap in logic. The issue before Judge Rupp was simply whether New Plan's judgment attached to the property, *given that the fraudulent conveyance was set aside.* Judge Rupp did not consider substantively the extent to which Citibank knew that Robert I. Melnick was the alter ego of Todd Realty, and he certainly did not consider whether Citibank had actual knowledge of New Plan's judgment. Thus, we disagree with New Plan's argument that Judge Rupp's opinion established that Citibank was "deemed to have had actual knowledge" of New Plan's lien.

■ We do agree, however, that the extent of Citibank's knowledge is a key factor in determining whether its lien is a first priority lien over New Plan's. *See G.E. Capital Mortgage Services, Inc.,* 338 Md. at 243, 657 A.2d 1170 ("One of the elements that permits a court to apply equitable subrogation is the absence of actual knowledge on the part of the subrogation claimant concerning the intervening lien."); *see also Bennett v. Westfall,* 186 Md. 148, 155, 46 A.2d 358 (1946). Besides attempting to extend Judge Rupp's language to the issue now before this Court, New Plan provides no factual support for its contention that Citibank had actual knowledge of New Plan's intervening lien. As no other evidence appears in the record to suggest whether Citibank had actual knowledge of New Plan's intervening judgment, we simply cannot decide this issue without further findings and/or clarification from the lower court.

Finally, we note that the lower court's order in this case as to the equitable subrogation issue is unclear and insufficient. Without making any specific factual determinations, the court merely stated that it "adopts the arguments of [New Plan] as set forth in its response to the exceptions."[2] In its response to Citibank's exceptions, New Plan raised two alternative arguments regarding this issue: (1) Citibank's equitable subrogation claim should not be decided by the court because it was untimely (the sheriff's sale had not yet occurred) and (2) the claim should be denied on its merits. If the court adopted New Plan's argument that the equitable subrogation claim was untimely, then it necessarily did not reach the merits of the claim. If the court adopted New Plan's argument that the equitable subrogation claim should be denied on its merits, this Court is unable to review effectively the lower court's judgment, as no specific findings of fact or conclusions were set forth in the order.

---

**2.** In the interest of clarity, we note that the court was referring to New Plan's response to Citibank's exceptions to the sheriff's sale at issue in this case, as opposed to the exceptions to the foreclosure sale filed by New Plan in the case before Judge Rupp.

Therefore, the lower court must either supplement its order with an explanation as to its findings or must hold an evidentiary hearing on Citibank's equitable subrogation claim following the execution sale (assuming the proceeds of the sale do not satisfy Melnick's debts to both Citibank and New Plan). The proceeds of the sale should then be distributed accordingly.

### Conclusion

We find that the trial court erred in denying Citibank's exceptions to the sheriff's sale. We therefore vacate the court's order and strike the court's ratification of the sale. We remand for further proceedings in accordance with this opinion.

**JUDGMENT REVERSED AND CASE REMANDED FOR A NEW EXECUTION SALE.**

**COSTS TO BE PAID BY THE APPELLEE.**