835 A.2d 239

**Edward GOLDSTEIN**

v.

**91ST STREET JOINT VENTURE, et al.**

**No. 1356, Sept. Term, 2002.**

Court of Special Appeals of Maryland.

Nov. 5, 2003.

172

Matthew Weir (Jonathan R. Topazian, Semmes, Bowen & Semmes, P.C. on the brief), Baltimore, for appellant.

Stephen J. Nolan (Daryl J. Sidle, Baxter, Baker, Sidle, Conn & Jones on the brief), Baltimore, for appellee.

Argued before HOLLANDER, SALMON, and JAMES R. EYLER, JJ.

SALMON, Judge.

This appeal concerns another engagement in an ongoing war between Edward S. Goldstein and entities controlled by Malcolm Berman. Facts related to other battles between these litigants have been discussed by us in *91st Street Joint Venture v. Goldstein,* 114 Md.App. 561, 691 A.2d 272 (1997) (*"Goldstein I "*), and *Goldstein v. 91st Street Joint Venture,* 131 Md.App. 546, 750 A.2d 602, *cert. denied,* 360 Md. 273, 757 A.2d 809 (2000) (*"Goldstein II "*).

## I.  *BACKGROUND*

The 91st Street Joint Venture is a Maryland general partnership, whose partners are Joint Venture Holding, Inc., Princess Hotel Limited Partnership (collectively, the "Berman Partners"), and Goldstein. Malcolm C. Berman controls the Berman Partners, which owns 99.9671 percent of 91st Street Joint Venture (hereinafter "the Partnership"), and Goldstein owns the remaining .0329 percent.

The Partnership built, and currently owns, the Princess Royale Hotel and Convention Center in Ocean City, Maryland. Serious disputes arose between the parties in the 1990's, resulting in the disputes being submitted to binding arbitration. On September 29, 1997, the arbitrator entered an award, which said in pertinent part: "[The Berman Partners] are ordered and directed to dissolve ... [the Partnership] in accordance with the Maryland Uniform Partnership Act." Immediately thereafter, still another dispute arose as to whether, under the terms of the arbitrator's decision, the Partnership should be dissolved pursuant to section 9–609(a)

of the Corporations and Associations Article of the Maryland Code (1975, 1993 Repl.Vol. & 1998 Supp.) or under section 9–609(b) of that article.

At all times here pertinent, section 9–609 was a part of the Maryland Uniform Partnership Act [1] ("UPA"). Section 9–609 provided, in pertinent part, as follows:

**Rights of partners as to application of partnership property.**

(a) *General rule.—When dissolution is caused* in any way, except *in contravention of the partnership agreement,* each partner, as against his copartners and all persons claiming through them in respect of their interests in the partnership, unless otherwise agreed, may have the partnership property applied to discharge its liabilities, and the surplus applied to pay in cash the net amount owing to the respective partners....

(b) *Dissolution caused in contravention of agreement.— When dissolution is caused in contravention of the partnership agreement,* the rights of the partners shall be as follows:

(1) Each partner who has not caused dissolution wrongfully shall have:

(i) All rights specified in subsection (a) of this section; and

(ii) The right, as against each partner who had *caused the dissolution wrongfully,* to damages for breach of agreement.

---

1. Unless otherwise indicated, all Uniform Partnership Act statutory references are to Maryland Code (1975, 1993 Repl.Vol., 1998 Supp.), Corporations and Associations Article.

The Act that now governs Maryland partnerships is the Revised Uniform Partnership Act (RUPA), Maryland Code (1974, 1993 Repl. Vol., 1998 Supp.), Corporations and Associations Art., section 9A–101 *et seq.,* which was adopted in July 1998 with a phase-in period that ended December 31, 2002. Until December 31, 2002, both UPA and RUPA coexisted, with section 9A–1204 determining which Act applied to a particular partnership's formation, termination, and any other conflict that may arise.

(2) The partners who have not *caused the dissolution wrongfully,* if they all desire to continue the business in the same name, either by themselves or jointly with others, may do so, during the agreed term for the partnership and for that purpose may possess the partnership property, provided they secure the payment by bond approved by the court, or pay to any partner who has caused the dissolution wrongfully, the value of his interest in the partnership at the dissolution, less any damages recoverable under paragraph (1)(ii) of this subsection, and in like manner indemnify him against all present or future partnership liabilities.

(Emphasis added.)

The Berman Partners contended that the arbitrator had determined that Goldstein caused the dissolution of the Partnership in contravention of the partnership agreement, and therefore, the Partnership should be dissolved pursuant to section 9–609(b). Goldstein, on the other hand, contended that, pursuant to the arbitrator's decision, the Partnership should be dissolved in accordance with section 9–609(a).

This dispute was the subject of a lawsuit filed in the Circuit Court for Baltimore County, in which the circuit court ruled that the Partnership should be dissolved in accordance with section 9–609(b). The court's decision was appealed to this Court. We reversed, saying:

We hold, based on the arbitrator's decision, that [the Berman Partners] had no right to wind up the affairs of the [Partnership] in accordance with section 9–609(b); instead, as Goldstein's lawyer pointed out to counsel for appellees in his letter of November 4, 1997, appellees were required to dissolve the Partnership in accordance with section 9–609(a). Therefore, the trial judge erred in granting summary judgment in favor of [the Berman Partners] and in dismissing Goldstein's cross-petition to enforce consent order and judgment confirming arbitration award.

*Goldstein II,* 131 Md.App. at 572, 750 A.2d 602.

Later in the *Goldstein II* decision, we said:

Although Goldstein does not get along with his partners, it is at least conceivable that they will agree to some remedy short of liquidation now that it has been decided that section 9–609(a) is applicable. Section 9–609(a) does not require liquidation if the parties agree otherwise. It might well be economically ruinous, or at least very expensive, for the Berman Partners to liquidate. On the other hand, if Goldstein were immediately paid his developer's fee plus the relatively minuscule value of his share of the partnership, some accommodation short of liquidation might be reached. We will leave it to the good judgment of the trial court to work out the mechanics of the dissolution.

*Id.* at 574, 750 A.2d 602.

In April 1998, which was prior to our decision in *Goldstein II*, all the assets of the Partnership were transferred to an entity known as "91st Street Joint Venture LLC" (hereinafter "LLC"). The transfer was made over the vehement objection of Goldstein. LLC was the assignee solely of the Berman Partners.

After remand, the Partnership's interest in the Princess Royale Hotel in Ocean City was, at the behest of the Berman Partners, appraised by Lippman Frizzell & Mitchell, LLC, who are specialists in Ocean City real estate and licensed appraisers. In a report dated April 4, 2001, Lippman Frizzell & Mitchell filed a lengthy report in which, using an "income approach," they concluded that the value of the Partnership interest was $45,100,000.[2]

Two weeks after receipt of the appraisal, the Berman Partners filed a motion in the Circuit Court for Baltimore County asking the court to order that the assets of the 91st Street Joint Venture be sold at a private sale and that a special master be appointed to wind up the Partnership. As part of that motion, the Berman Partners submitted their proposal, expressed their concerns, and suggested the manner

---

**2.** The figure of $45,100,000 was inclusive of cash and other current assets of the Princess Royale Hotel.

by which the private sale and wind up of the Partnership should be conducted.

Goldstein filed a brief in reply to the Berman Partners' proposal, in which he asked the court to appoint a receiver to conduct the liquidation of the Partnership in order to "obtain the highest price possible for the partnership assets." Goldstein requested that the assets of the Partnership, which had been transferred to LLC, "be returned to the partnership," because the Berman Partners had no right to transfer those assets without his consent as a general partner. Goldstein did not contend, at that point, that the Berman Partners should be prohibited from purchasing the Partnership assets.

The Berman Partners filed a reply brief, in which they opposed the transfer of LLC's assets back to the Partnership. They contended that the transfer would be expensive because a huge tax charge would be incurred; they maintained that this would be unfair because the transfer to LLC had been made in good faith, based upon advice of counsel, and prior to the decision in *Goldstein I.*

The circuit court conducted a hearing on June 19, 2001, in which it considered argument of counsel as to how the sale of the assets of the Partnership should be handled. The court then announced that it would appoint a trustee to conduct a private sale of the assets of the Partnership. The judge made it clear that he would allow the trustee to do whatever he needed to do, with the court's approval, to facilitate the sale and that the trustee would work under the court's supervision.

Counsel for Goldstein asked the court for a forty-five-day period within which Goldstein could obtain an appraisal of the Partnership's assets. Goldstein's counsel asserted that in order to arrive at a valid appraisal, he would need the cooperation of the Berman Partners. In particular, cooperation was needed to obtain valid financial information concerning the Partnership. The court agreed that the Berman Partners would be ordered to supply the information Goldstein needed.

On June 22, 2001, the court filed an order directing the private sale of the assets of the Partnership and the appointment of Daniel J. Dregier, Jr., Esq., as a trustee "to oversee and conduct the private sale and the wind-up of the Partnership, with the authority, subject to the further order and approval of this [c]ourt, to engage, if necessary, third-party professionals to assist with the performance of the duties hereunder." The court's order, additionally (1) allowed the parties, within forty-five days, to submit an appraisal of the value of the Princess Royale Hotel complex; (2) allowed the appraisal, already performed by Lippman Frizzell & Mitchell, to be deemed "to have been timely filed in accordance with the provisions of this order"; (3) ordered that the Berman Partners "make available to all appraisers engaged pursuant to this Order all of the information that [the Berman Partners] made available to Lippman, Frizzell & Mitchell," provided that the appraiser first sign "an appropriate Confidentiality And Non–Disclosure statement"; (4) announced that the court and the trustee, "in consultation with counsel for the parties, will determine the specific procedures for a private sale of the Partnership's assets"; and (5) ordered

that the Trustee shall make his report of sale in accordance with the procedures of Md. Rule 14–305, and the provisions of Rule 14–305 shall be applicable after the sale; provided that any exceptions to the sale or claims against the proceeds of such sale shall be filed within forty-five (45) days after the date of a notice issued pursuant to Md. Rule 14–305(c) [and reserved] until a future date the determination of whether to appoint a [s]pecial [m]aster to hold a hearing and submit recommendations to this [c]ourt concerning the disposition to be entered by the [c]ourt with respect to any such exceptions to sale or with respect to any such claims against the proceeds of the sale.

The court passed two additional orders on June 22, 2001. The first allowed LLC, "as the legal titleholder of the ... property of [the Partnership], a dissolved Maryland general partnership," the right to intervene as a "party plaintiff petitioner." The second order allowed the Council of Unit Own-

ers of Princess Royale Resort Condominium the right to intervene as a plaintiff.[3]

On August 16, 2001, counsel for the parties met with the trustee to discuss procedures for the sale of the Partnership's assets. In advance of the meeting, counsel for the Berman Partners submitted, in writing, suggestions as to how the sale should be conducted. Goldstein's counsel, on August 22, 2001, submitted his proposed procedures, which were much different than those proposed by his opponents. The trustee, on August 30, 2001, informed counsel that, in concert with the judge who had appointed him, he would "make every effort to expedite the filing procedures for the private sale of the assets of the Partnership."

On October 15, 2001, the Berman Partners submitted an offer to the trustee of $97,517,000 for the interest of the LLC, contingent upon the Berman Partners receiving a 99 percent credit. The proposed credit represented the Berman Partners' approximate interest in the Partnership. The offer amount was more than twice the appraised value of the partnership assets, but, in legal effect, the dollar amount offered was quite small, i.e., only $975,517. That latter sum was, however, more than enough to buy out Goldstein's interest in the Partnership. The record is unclear, however, as to whether the offer, if accepted, was sufficient to pay off all creditors of the Partnership,[1] nor was there any indication that the bidder intended to pay off immediately the indebtedness of the Partnership.

By letter dated November 9, 2001, the trustee requested that the Berman Partners submit a contract of purchase that

---

**3.** The Princess Royale Hotel complex in Ocean City is made up of 340 suites. Of those suites, sixty-six are owned by individuals represented by the Council of Unit Owners of Princess Royale Resort Condominium. There is also a commercial unit that is owned by the Partnership as part of the Princess Royale complex. Common elements are owned as tenants in common between the Partnership and the owners of the sixty-six condominium units.

**4.** At oral argument, it was suggested that the Partnership indebtedness was only about $500,000.

he and the court could review along with any other interested parties. A proposed contract was submitted by the Berman Partners on November 19, 2000; it provided that, for the price mentioned, the trustee would sell to the Berman Partners one hundred percent of the trustee's membership interest in the LLC, which was the entity that previously had been assigned all the assets of the Partnership.

Goldstein promptly objected to the proposal that the Berman Partners be given credit for its 99 percent ownership when it bid.

On December 7, 2001, the trustee wrote a letter in which he rejected the Berman Partners' proposed contract. The trustee said:

Following our telephone conference last week, I met with [the trial court] and discussed the details of the guidelines that we wish to implement in this case. We also reviewed the credit application issue and whether or not it would be applicable to the parties in this matter. I direct your attention to the case of *Citibank Federal Savings Bank, et al. v. New Plan Realty Trust, et al.,* 131 Md.App. 44, 748 A.2d 24 (March, 2000). We believe this case is instructive and one in which [the trial court] and I concur should be dispositive of the [99 percent credit] issue.

Additionally, it is the Trustee's determination that the present offer from [the Berman Partners,] is not a qualifying offer, unless or until it meets the conditions of Mr. Topazian's [counsel for Goldstein] proposed qualifying offer terms, as set forth in item no. 5 of his letter to the Trustee dated August 22, 2001. Consequently, I am returning herewith, under separate cover and hand delivered, Mr. Nolan's Contract of Sale and draft representing the deposit. If Mr. Nolan chooses to re-submit a contract, he may do so. In the meantime, I will be conferring with a consultant/broker specializing in resort hotel sales in order to solicit other qualifying offers that comply with those terms.

Furthermore, the Trustee will entertain all other qualified offers for a period of sixty (60) days following receipt of any

qualified offer by way of written contract and will allow any and all other qualified offers to be submitted for consideration, with ultimately the highest bidder prevailing, subject to the Court's acceptance. The Trustee will report to the parties the status and receipt of all bids during the 60 day period. Following the Trustee's Report of Sale, in accordance with Maryland Rule 14–305, exceptions to the sale or claims against the proceeds of such sale, shall be filed within forty-five (45) days after the date of notice issued pursuant to Maryland Rule 14–305(c) as ordered by the Court.

I apologize to all of you for not communicating with you earlier, but given both [the trial court's] schedule and mine in the past few weeks, we have not been able to disseminate this information to you sooner. I trust that we can now move forward to conclude the sale of the partnership assets as the Court has ordered.

Paragraph 5 of Goldstein's counsel's August 22, 2001, letter to which the trustee referred, read:

*Offers/Contingencies/Warranties/Deposits/ Transfer Taxes/Closing.* The Trustee shall evaluate and determine all qualified offers, which must be in writing. All qualified offers must be equal to or in excess of the Total Value of the Joint Venture (less cash and assets unrelated to operation of the Princess Royale) utilizing the Lippman Frizzell appraisal. Certain contingencies, such as physical inspection in addition to title examination, are so commercially standard and reasonable that the Trustee must not deprive a prospective purchaser of these rights. Otherwise, there will be no prospective purchasers. A financing contingency is not absolutely necessary. Ultimately, however, the Trustee must have the discretion to decide whether a contingency or warranty is commercially reasonable in light of the purchase price. The contract must allow that the seller warrants and represents that the financial information provided is accurate in all material respects. A $4,500,000 10% deposit is agreeable, but is forfeitable only if the prospective purchaser fails to perform as required under the contract. All deposits will be held by the Trustee. The purchaser must

pay transfer and recordation taxes, however, if the State or Worcester County determines exemptions were erroneously granted to the Partnership or the LLC as a result of past transfer(s), the 91st Street Joint Venture must indemnify any prospective purchaser for such taxes which may become due. A 60 day closing period is essential for prospective purchasers who intend to use financing.

Counsel for Goldstein, on December 10, 2001, made several written objections to the procedures outlined in the trustee's December 7, 2001, missive. First, counsel reiterated Goldstein's objection to the Berman Partners being granted a 99 percent credit for their ownership interest in the joint venture. Second, Goldstein took the position that the Berman Partners "are absolutely prohibited from continuing the partnership business without Mr. Goldstein's authorization and consent." Additionally, Goldstein maintained that LLC could not be designated as the seller of the Princess Royale Hotel because it unlawfully was granted title to the hotel. In regard to this last-mentioned argument, counsel for Goldstein said:

> [I]t is undisputed that Mr. Berman lacked authority to transfer the Princess Royale Hotel to the LLC. No responsible third-party would even consider bidding until the Hotel and all other partnership assets are transferred back to their rightful owner. Indeed, there is a significant cloud on title posed by the improper evasion of transfer and recordation taxes, as well as the serious legal issues arising from Mr. Berman's improper looting of at least $17,038,158 in partnership assets held by the LLC without the authorization of the Court or Mr. Goldstein, a general partner.

(Footnote omitted.)

The Berman Partners on December 14, 2001, submitted a proposed new contract. This time the purchase price was reduced from the original $97,517,000 to $65,000,000. That proposed contract was rejected by the trustee.

By letter dated January 14, 2002, the Berman Partners submitted a third proposed contract to the trustee, in which they offered $97,000,000, subject to application of a 99 percent

purchase-price credit. The trustee, in a letter dated January 22, 2002, advised that he had signed the proposed agreement of sale but would nevertheless entertain other "qualified offers" for a period of sixty days.

The contract, which the trustee signed, provided in part:

WHEREAS, legal title to all of the [joint venture's] assets is currently held by ... LLC ..., as nominee for the benefit of the [Partnership];

WHEREAS, pursuant to an Order dated June 22, 2001, the LLC was permitted to intervene in the Case as a party plaintiff and the LLC and its assets are now subject to the jurisdiction of the Circuit Court for Baltimore County, Maryland, and the supervision of Daniel J. Dregier, Jr., as trustee;

\* \* \*

1. **Sale of Interests in the LLC.**

(a) Upon the terms and subject to the conditions set forth in this Agreement, at the Closing, *the Seller shall sell, assign, and transfer to the Buyer, and the Buyer shall purchase from the Seller, all of the Seller's right title and interest in and to all of the membership interests in the LLC* (the "Assets"). It is understood and agreed by the Buyer and the Seller that since the LLC holds all of the Partnership's assets as a nominee for the benefit of the Partnership, *the Seller holds equitable and beneficial title to the Assets* and the sale to the Buyer of all of the membership interests in the LLC will effect the transfer to the *Buyer of all of the Partnership's assets, subject to all of the Partnership's liabilities.* The entities comprising the Buyer shall purchase the Assets in the following proportions: (i) [Joint Venture Holding, Inc.]—73.73%; and (ii) [Princess Hotel Limited Partnership]—26.25%.

(Emphasis added.)

The sales agreement also acknowledged that the Berman Partners had made a $4,500,000 deposit.

In addition, the agreement signed by the trustee provided that the Berman Partners would

be entitled to a credit at the Closing (against the buyer's distributive share of the Partnership's assets and wind up) for an amount equal to 99 percent of the Purchase Price. The balance of the Purchase Price shall be distributed to the Partners as a distribution in liquidation of the partnership.

An addendum to the agreement of sale was signed by the trustee and by Malcolm Berman on behalf of the Berman Partners on February 6, 2002. The most important change was that the addendum provided for an adjustment of price, which ultimately increased the sale price to $98,819,808.

The trustee received no other bids, and on March 25, 2002, the trustee filed a notice of sale and a report of sale in the circuit court. Goldstein filed timely exceptions to the sale, and the Berman Partners filed their responses. On July 12, 2002, the circuit court denied Goldstein's exceptions and approved the sale.

## II. *QUESTIONS PRESENTED*

1. Was the sale of partnership assets in compliance with the Maryland Uniform Partnership Act and the opinion in *Goldstein I?*

2. Was the sale of partnership assets in accordance with the circuit court's June 22, 2001, order?

Goldstein contends that under section 9–609(a) he had "an unequivocal right to 'have the partnership property applied to discharge the liabilities, and the surplus applied *to pay in cash* the net amount owing to the respective partners.'" (Quoting *Goldstein II,* 131 Md.App. at 548, 750 A.2d 602.) Goldstein maintains that his rights were violated when the trustee and the circuit court adopted a "credit procedure under which [the Berman Partners] were not obligated to pay 99 percent of the supposed purchase price for the assets of the partnership." Goldstein points out that a dissolution under 9–609(a), which

was mandated by the *Goldstein II* decision, differs markedly from a dissolution under section 9–609(b).

In *Bromberg and Ribstein on Partnership*, Vol. II, Pages 7:153–55 (2003 Supp.), the authors state:

> The right to application of assets exists under the terms of the statute [Uniform Partnership Act] when the dissolution is not "in contravention of the partnership agreement" or caused by the expulsion of a partner, and when the partners have not "otherwise agreed" in the partnership agreement.
>
> The right to application of property is generally held to *involve an actual sale of the property rather than a distribution in kind to the partners.* This follows from the language of [§ 9–609(a) ],[5] which *requires discharge of liabilities and cash payments to the partners.* The rule rests partly on the practical consideration that sale of the partnership assets may be the only way to solve the valuation problem and ensure that the assets are allocated fairly to the partners. There are other justifications. Undivided interests force partners who probably wish to go their separate ways to maintain a joint ownership relationship; partners who are forced to accept a distribution in kind may get property they do not want; and distribution in kind may permit the recipient partner to delay recognition of gain for tax purposes, thus giving them an advantage over partners who sell out for cash and must recognize appreciation as taxable income.

(Footnotes omitted.)

The Berman Partners do not dispute that section 9–609(a) requires that all the assets be sold and reduced to cash.[6] Instead, they argue:

> The section expressly provides that it is subject to the agreement of the partners. In this case, the circuit court exercised its discretion *to modify a provision the partners*

---

5.  The treatise refers to section 38(1) of the Uniform Partnership Act, which is identical to section 9–609(a).

6.  Compare *Creel v. Lilly,* 354 Md. 77, 729 A.2d 385 (1999).

*themselves could have modified.* The partners authorized the court to exercise such discretion when the consent order they submitted following the June 19, 2001, hearing failed to require strict compliance with the requirements of § 9–609(a). Such discretion was exercised by the circuit court twice pursuant to the express grant in *Goldstein [I ]*.

(Emphasis added.)

The "consent order" to which appellees refer is the order signed by the court on June 22, 2001. It is true, as the Berman Partners argue, that under section 9–609(a) the parties could have agreed to change the requirement that all assets be liquidated, the debts paid off, and the remaining cash divided. But nowhere in the consent order of June 22, 2001, are the requirements of section 9–609(a) even mentioned, much less waived. Moreover, at no other point in the proceedings below did Goldstein agree to waive the requirements of section 9–609(a). And, nothing in the *Goldstein II* opinion gave the circuit court "discretion" to modify the provisions of that section.

■ While it is true, as the Berman Partners point out, that the "consent" order did not specify that the trustee would proceed in "strict compliance with the requirements of section 9–609(a)," there was no reason for such a specification because our decision in *Goldstein II* required that section 9–609(a) be. followed unless the parties otherwise agreed. In short, there is no provision in the June 22, 2001, order that can be interpreted legitimately as a waiver by Goldstein of his rights under section 9–609(a).

■ Rather than sell the assets and then pay off all the debts of the Partnership, the Trustee, after giving a 99 percent credit to the buyer, sold all the assets to the Berman Partners "subject to all of the partnership liabilities."

We can see no way that the statutory mandate of section 9–609(a), which allows partners in Goldstein's situation to insist on a liquidation of the assets, payment of all partnership assets, and a distribution of the remaining cash, can be

squared with the procedure adopted by the circuit court in this case.

In essence, the court allowed the Berman Partners to submit a bid for Goldstein's proportionate interest in the assets of the Partnership. This would be entirely legitimate if Section 9–609(b) could be utilized, and this is essentially what the Berman Partners attempted to do, and what the circuit court allowed them to do, prior to our decision in *Goldstein II.*

Goldstein further argues that the Berman Partners were required to put up cash when they purchased assets.

The case of *Citibank Fed. Sav. Bank v. New Plan Realty Trust,* 131 Md.App. 44, 748 A.2d 24 (2000), is instructive. In the *Citibank* case, New Plan Realty Trust had a $900,000 judgment against a property owner. *Id.* at 50, 748 A.2d 24. A sheriff's sale was scheduled to ensure payment of the debt. According to the terms of the sale, the purchaser was required to make a $5,000 deposit at the time of sale, with the balance of the purchase price to be paid within ten days after ratification by the court. *Id.* at 51, 748 A.2d 24. The advertisement for the sale provided that the deposit and the remaining balance be paid in U.S. currency or certified check payable to the "sheriff of Montgomery County." *Id.* The judgment creditor appeared at the sheriff's sale and bid $500,000, which was the high bid. Nevertheless, the judgment creditor did not make the $5,000 deposit in cash; instead, it applied its judgment as a credit against the amount of the deposit. The judgment creditor also applied its judgment to pay the balance due and owing on the property. Citibank, a junior lien holder, filed exceptions to the sale. It argued that the judgment creditor "should have paid the deposit in the form of cash or a cashier's check made payable to the sheriff" and then paid the balance to the sheriff within ten days. It further argued that, after the auditor's report had been filed and ratified, the sheriff would then have issued a check to the judgment creditor in the amount of $500,000. *Id.* at 52, 748 A.2d 24.

The *Citibank* Court said that "we do not subscribe to this circular approach." *Id.* Instead, we adopted the "well set-

tled" rule in Maryland "that a mortgagee may purchase the mortgaged property at a foreclosure sale by applying the mortgage debt to the purchase price, rather than by paying with cash or a certified check." *Id.* at 52, 748 A.2d 24. Although *Citibank* is, in many ways, factually distinguishable from this case, it is nevertheless at least somewhat analogous in that the party objecting to the sale in this case, as in *Citibank*, insisted that his opponent engage in a "circular procedure"—and we rejected that procedure.

The case of *Owen v. Cohen*, 19 Cal.2d 147, 119 P.2d 713 (1941), is also instructive. In *Owen*, the court adopted a common-sense approach somewhat similar to that later approved by us in *Citibank*. *Owen* dealt with a sale necessitated because the objecting partner had breached the partnership agreement. *Id.* at 719. Under section 2426 of the California Civil Code, a decree of judicial dissolution of a partnership was authorized, under certain circumstances, *viz:*

"(1) On application by or for a partner the court shall decree a dissolution whenever:

"(c) A partner has been guilty of such conduct as tends to affect prejudicially the carrying on of the business,

"(d) A partner wilfully or persistently commits a breach of the partnership agreement, or otherwise so conducts himself in matters relating to the partnership business that it is not reasonably practicable to carry on the business in partnership with him,

"(f) Other circumstances render a dissolution equitable."
*Id.* at 716.

The *Owen* Court held that under section 2426 dissolution was justified based upon one partner's (the defendant's) persistence "in the commission of acts provocative of dissension and disagreement" with the other partners, which made it impossible for the continuation of the partnership business. *Id.* at 716.

In *Owen*, the Court allowed the bidding partner a credit "to the extent of any sum which will accrue to him" out of the

sales proceeds. The dissenting partner objected to the credit. The Court disposed of the objection as follows:

Defendant's argument is not only unsound in view of the precise wording employed by the court in reference to the conduct of the sale, but it likewise fails to present in its entirety that portion of the decree of which the clause in question is but a part. Exactly the same provision concerning the use of credit was made for the benefit of defendant, so that in this respect the parties were placed on an equal footing. Moreover, the extension of credit has no bearing upon the bidding as such, for plaintiff and defendant, as other bidders at the sale, still must state their offers for the purchase of the partnership assets in terms definite as to amount; therefore, the competitive spirit customarily present on such occasions will in nowise be disturbed. It is manifest from the court's language that the single circumstance which will give operative force to the applicable credit provision is the prevalence of plaintiff or defendant over other participants in the building. In such event the receiver, as part of the mechanics of computing the division of the proceeds, must, if so requested, take into account the sums of money which "will accrue" to the party bidding in the property and credit such amount against the cash figure constituting the prevailing bid. *To pay money to the receiver merely to have it returned would be an idle ceremony, as the court recognized in its decree.* In the case of an ordinary sale under execution the practice of the sheriff's taking the creditor's receipt instead of cash was approved in *Mitchell v. Alpha Hardware & Supply Company*, 7 Cal. App.2d 52 [45 P.2d) 442], . . . wherein it was said at page 61: "Thus, . . . if the sheriff accepts the receipt, and the judgment is satisfied, in substance and effect it amounts to the same thing as though actual cash had been passed to and fro, from purchaser to sheriff and sheriff to purchaser."

The fact that at an execution sale the amount owing to the judgment creditor is known *before* the sale while in the present situation the credit to which plaintiff or defendant

will be entitled cannot be ascertained until *after* the receiver's sale is immaterial, for in neither case does certainty as to such allowance affect the conduct of the bidding. In each instance the credit is definitely fixed at the time of its consideration, which is *after* the consummation of the sale. Nor is it of consequence that it is obligatory upon the receiver here, in the event that either plaintiff or defendant prevails in the bidding at the sale of the partnership assets, to approve such party's tender of credit owing him, in lieu of cash, whereas the acceptance of a like offer from a successful judgment creditor at an execution sale is wholly volitional on the part of the sheriff. The procedure prescribed by the court here, after a consideration of all the facts presented in this equity proceeding, was a matter purely within its discretion, and no abuse thereof appears from the record. In accord with this analysis, it is our opinion that the questioned portion of the decree is proper in every respect.

*Id.* at 716–17 (emphasis added).

We agree generally with the thrust of the *Owen* Court's analysis. It would ordinarily be an "idle ceremony" involving a waste of time and money to fail to give a credit, in lieu of cash, to a partner who bids on partnership assets. After all, the goal of the sale is to obtain the highest bid possible. The "credit" method encouraged the Berman Partners to bid high, which indisputably benefitted Goldstein financially, although it undoubtedly constituted a setback in his personal war with Berman.

The "credit procedure" may only be used in a sale under section 9–609(a), however, if the amount of cash generated by the bid is sufficient to pay off (1) all indebtedness of the partnership; (2) all trustees, and other expenses of sale; and (3) the partner(s) who do not bid or who are unsuccessful bidders.

Here, the Partnership's debts were not paid out of the proceeds of sale, and Goldstein has a right to insist that the indebtedness be paid. The Berman Partners, as part of their bid, simply assumed the Partnership's debts.

What is supposed to be done under section 9-609(a) is to sell the assets, then pay off all indebtedness of the Partnership, and then distribute the remainder to the partners in accordance with their respective partnership interests. This was not done in this case, and accordingly, the exceptions should have been sustained and the sale vacated on that basis.

Upon remand, if the Berman Partners resubmit a bid, the court, in the exercise of its discretion, may allow a partner who submits a bid a credit toward the bid price of its (or his) percentage interest in the Partnership, provided the bid is high enough to pay off all partnership debts in cash, all expenses of sale, and the value of the share of the partnership of the partner who either does not bid or whose bid is rejected.

### III. *OTHER MATTERS*

There are two other contentions, which will likely arise on remand, which we shall address.

### A.

■ Goldstein contends that the Berman Partners should not be allowed to bid on the property. We disagree.

In *Bromberg and Ribstein on Partnership,*[7] the authors say:

> Assuming the partnership assets are liquidated under [section 9-609(a) ], the business may still be continued as a going concern. The partners who wish to continue may buy at an adequately publicized sale, although in some cases a partner may have a duty not to use superior leverage to obtain the business at a bargain price.

ALAN R. BROMBERG & LARRY E. RIBSTEIN, BROMBERG AND RIBSTEIN ON PARTNERSHIPS 7:156 (1988)(footnote omitted).

We see no reason, nor has Goldstein suggested any, why a different rule should be here applied.

---

7. We note that Goldstein cites the *Bromberg and Ribstein* treatise with approval in other parts of his brief.

**B.**

█   As mentioned earlier, what the trustee sold in this case was "100% of LLC Membership Interest." But, as Goldstein points out, the Berman Partners had no right to transfer the Partnership's assets to LLC in 1998.[8]

Goldstein argues:

Yet another reason that the Princess Royale Hotel must be transferred back to the Partnership relates directly to the Trustee's duty to sell the Princess Royale. In 1998, the Berman Partners transferred the Princess Royale Hotel to the LLC, taking advantage of transfer and recordation tax exemptions under § 12–108(y) and 13–207(18) of the Tax Property Article of the Annotated Code of Maryland. Those tax exemptions under § 12–108(y) and 13–207(18) of the Tax Property Article exist for transfers from a partnership to a limited liability company where the partners in the partnership are the same as the members in the limited liability company.

On April 10, 1998, Malcolm Berman, who dominates and controls the Berman partners, signed an affidavit to the effect that the partners in the Partnership were the same as members in the LLC, thereby exempting the transfer from taxes. This representation was incorrect since Appellant was a partner but was not a member in the LLC. Because of this fact and in light of the Court of Appeals holding in *Read v. Anne Arundel County*, 354 Md. 383, 731 A.2d 868 (1999) that the step transaction doctrine applies to transfer and recordation taxes.

(Reference to extract omitted.)

Goldstein argued below that in light of the way LLC acquired the Partnership's assets, an independent bidder on the Partnership's assets would not dare to bid on the property

---

8. The contract of sale approved by the court said that LLC held the assets as a nominee of the Partnership. It is not at all clear that this is true. Those assets were transferred without the consent of Goldstein, a general partner. As far as we can discern, because Goldstein never approved, LLC was a nominee of the Berman Partners but not the Partnership.

because of possible tax liability. This concern was addressed by the trustee when he adopted paragraph 5 of Goldstein's counsel's submission of August 22, 2001. Terms of the sale included a provision that in the event that the tax exemptions were determined to be erroneously allowed when the transfer to LLC was made, then the Partnership would indemnify the purchaser. So long as a similar sales term appears in any future contract, we can (under the peculiar circumstances of this case) foresee little likelihood that persons or entities would be dissuaded from bidding.

All parties concede that if the Court required LLC to transfer the assets back to the Partnership, a large tax expense would be incurred. In our view, such an expenditure of funds is unnecessary. Because the transfer of assets to LLC was illegal, the Partnership is indisputably still the equitable owner of the assets. LLC does not disagree and is willing to waive its paper interest in the assets. So long as LLC maintains that position, we see no need for LLC to formally transfer its interest back to the Partnership.

**JUDGMENT VACATED; CASE REMANDED TO THE CIRCUIT COURT FOR BALTIMORE COUNTY FOR FURTHER PROCEEDINGS CONSISTENT WITH THE VIEWS EXPRESSED IN THIS OPINION; COSTS TO BE PAID BY APPELLEES.**